BACARDI CORPORATION OF AMERICA *v.* DOME-
NECH, TREASURER OF PUERTO RICO, ET AL.

No. 21. Argued October 22, 1940.—Decided December 9, 1940.

Messrs. *Edward S. Rogers* and *Preston B. Kavanagh,* with whom Messrs. *Karl D. Loos* and *Jerome L. Isaacs* were on the brief, for petitioner.

*Mr. William Cattron Rigby,* with whom Messrs. *George A. Malcolm,* Attorney General of Puerto Rico, and *Nathan R. Margold* were on the brief, for Manuel V. Domenech, Treasurer of Puerto Rico, respondent; and *Mr. David A. Buckley, Jr.* for Destileria Serralles, Inc., intervenor-respondent.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

This case presents the question of the validity of legislation of Puerto Rico prohibiting the use of trade marks, brands, or trade names, on distilled spirits manufactured

in Puerto Rico if the marks, brands, or names had previously been used anywhere outside Puerto Rico, unless they had been used on spirits manufactured in Puerto Rico on or before February 1, 1936, or in the case of trade marks they had been used exclusively in continental United States prior to that date.

Petitioner, Bacardi Corporation of America, brought this suit in the District Court of the United States for Puerto Rico against the Treasurer of Puerto Rico to have this legislation declared invalid and its enforcement enjoined. The complaint charged invalidity under the Fifth Amendment and the commerce clause of the Constitution of the United States, the Organic Act of Puerto Rico, the Federal Alcohol Administration Act, and the General Inter-American Trade-Mark Convention of 1929. The Destileria Serralles, Inc., a Puerto Rican corporation, was permitted to intervene as a defendant.

The District Court held the legislation invalid and issued a permanent injunction. The Circuit Court of Appeals reversed the decree and directed the dismissal of the complaint. 109 F. 2d 57. In view of the importance of the questions, we granted certiorari. 309 U. S. 652.

The findings of the District Court, which were not disturbed by the rulings of the Circuit Court of Appeals, show the following:

Petitioner, Bacardi Corporation of America, is a Pennsylvania corporation authorized to manufacture distilled spirits. By agreement, petitioner became entitled to manufacture and sell rum in Puerto Rico under the trade marks and labels of Compania Ron Bacardi, S. A., a Cuban corporation. For more than twenty years, save for the period during national prohibition, the Cuban corporation and its predecessors had sold rum in Puerto Rico and throughout the United States under trade marks

which included the word "Bacardi," "Bacardi y Cia," the representation of a bat in a circular frame, and certain distinctive labels. These trade marks were duly registered in the United States Patent Office and in the Office of the Executive Secretary of Puerto Rico prior to the legislation here in question.

Bacardi rum has always been made according to definite secret processes, has been extensively advertised and enjoys an excellent reputation. Under petitioner's agreement with the Cuban corporation, all rum designated by the described trade marks and labels was to be manufactured under the supervision of representatives of the Cuban corporation and to be the same kind and quality as the rum that the latter manufactured and sold.

In March, 1936, petitioner arranged for the installation of a plant in Puerto Rico. Since March 31, 1936, petitioner has been duly licensed to do business in Puerto Rico under its laws relating to foreign corporations. Petitioner's basic permits from the Federal Alcohol Administration were amended so as to enable petitioner to operate in Puerto Rico and its labels were approved. Petitioner rented a building in Puerto Rico and spent large sums in installing its plant.

On May 15, 1936, the legislature of Puerto Rico passed Act No. 115 known as the "Alcoholic Beverage Law" which, after providing for permits, prohibited the holder of a permit from manufacturing any distilled spirits which were "locally or nationally known under a brand, trade name, or trade-mark previously used on similar products manufactured in a foreign country, or in any other place outside Puerto Rico," with a proviso excepting brands, trade names, or trade marks used on spirits "manufactured in Puerto Rico on February 1, 1936," and also "any new brand, trade name, or trade-mark which

may in the future be used in Puerto Rico." [1] This Act was declared to be of an experimental nature. It was repealed by Act No. 6 of June 30, 1936, which contained a similar provision and added a prohibition against exports in bulk. [2] That Act was to be in force until September 30, 1937. It was, however, converted into permanent legislation by the provisions of Act No. 149 of May 15, 1937, known as the "Spirits and Alcoholic Beverages Act." [3]

Declaring it to be the policy of the legislature "to protect the renascent liquor industry of Puerto Rico from all competition by foreign capital," [4] the Act of 1937 provided in §§ 44 and 44 (b) as follows:

[1] These provisions were as follows (Laws of Puerto Rico, 1936, pp. 610, 644, 646):

"(g) No holder of a permit under this title shall manufacture, distill, rectify, or bottle, either for himself or for others, any distilled spirit locally or nationally known under a brand, trade name, or trade-mark previously used on similar products manufactured in a foreign country, or in any other place outside Puerto Rico; *Provided*, (1) That such limitation, aimed at protecting the industry already existing in Puerto Rico, shall not apply to any brand, trade name, or trade-mark used by a manufacturer, rectifier, distiller, or bottler of distilled spirits manufactured in Puerto Rico on February 1, 1936; and (2) such restriction shall not apply to any new brand, trade name, or trade-mark which may in the future be used in Puerto Rico."

"(h) If any kind, type, or brand of distilled spirits of a foreign origin becomes nationally or internationally known by reason of its bearing or showing as its brand, trade name, or trade-mark, the proper name of the manufacturer thereof, such name shall not, in any manner or form whatever, appear on the labels for any distilled spirit of said kind or type manufactured, distilled, rectified, or bottled in Puerto Rico."

[2] Laws of Puerto Rico, Third Special Session, 1936, p. 78.

[3] Laws of Puerto Rico, 1937, p. 392.

[4] This declaration is as follows:

"Section 1 (b). *Declaration of Policy*. It has been and is the intention and the policy of this Legislature to protect the renascent

"Section 44.—No holder of a permit granted in accordance with the provisions of this or of any other Act shall distill, rectify, manufacture, bottle, or can any distilled spirits, rectified spirits, or alcoholic beverages on which there appears, whether on the container, label, stopper, or elsewhere, any trade mark, brand, trade name, commercial name, corporation name or any other designation, if said trade mark, brand, trade name, commercial name, corporation name, or any other designation, design, or drawing has been used previously, in whole or in part, directly or indirectly, or in any other manner, anywhere outside the Island of Puerto Rico: *Provided,* That this limitation shall not apply to the designations used by a distiller, rectifier, manufacturer, bottler, or canner of distilled spirits manufactured in Puerto Rico on or before February 1, 1936."

"Section 44 (b).—Distilled spirits, with the exception of ethylic alcohol, 180° proof or more, industrial alcohol, alcohol denatured according to authorized formulas, and denatured rum for industrial purposes, may be shipped or exported from Puerto Rico to foreign countries, to the continental United States, or to any of its territories or possessions, or imported into Puerto Rico, only in containers holding not more than one gallon, and each container shall bear the corresponding label containing the information prescribed by law and by the regulations of the Treasurer; . . ." [5]

It is these sections which petitioner attacks.

---

liquor industry of Puerto Rico from all competition by foreign capital so as to avoid the increase and growth of financial absenteeism and to favor said domestic industry so that it may receive adequate protection against any unfair competition in the Puerto Rican market, the continental American market, and in any other possible purchasing market."

[5] There followed in § 44 (b), after the provision quoted in the text, a proviso relating to the liquidation of a stock of rum where a rectifier wishes to withdraw from business.

Section 7 of the Act of 1937 amended the proviso of § 44 so as to make its limitation applicable, in regard to trade marks only, to such "as shall have been used exclusively in the continental United States" prior to February 1, 1936.[6] Petitioner asserts that in the absence of this last provision, there would have been two distillers whose trade marks would be subject to the prohibition of § 44, that is, petitioner and one other; and that § 7 protected the other manufacturer, leaving petitioner, whose marks had been used in foreign countries and not exclusively in continental United States, the only concern affected by the prohibition. The District Court said that the Act had the appearance of being framed so as to exclude only the plaintiff and that it was difficult to conceive of "a more glaring discrimination." In this relation petitioner cites the critical reference in *McFarland* v. *American Sugar Refining Co.*, 241 U. S. 79, 86, to a statute which "bristles with severities that touch the plaintiff alone." The Circuit Court of Appeals while recognizing the immediate bearing of the provision as thus challenged sustained it "as applying to all who might later engage in the business."

That construction, however, does not touch the essential character of the discrimination which the statute seeks to effect in the use of trade marks. The statute does not deal with the admission of corporations, foreign to Puerto Rico, for the purpose of transacting business in the Island. Petitioner received its local license. Nor

---

[6] Section 7 is as follows: "In regard to trade marks, the provisions of the *Proviso* of Section 44 of Act No. 6, approved June 30, 1936, and which is hereby amended, shall be applicable only to such trade marks as shall have been used exclusively in the continental United States by any distiller, rectifier, manufacturer, bottler, or canner of distilled spirits prior to February 1, 1936, provided such trade marks have not been used, in whole or in part, by a distiller, rectifier, manufacturer, bottler, or canner of distilled spirits outside of the continental United States, at any time prior to said date."

does the statute prohibit the manufacture of rum in Puerto Rico. That is allowed. Petitioner received permits from Puerto Rico for that manufacture as well as the basic permits from the Federal Alcohol Administration. The statutory restriction is not on doing business or manufacturing apart from the use of petitioner's trade marks and labels to designate its product. As to these trade marks and labels, the prohibition does not rest on lack of proper registration under the local law. Petitioner's trade marks have been duly registered in the United States and Puerto Rico. Nor does the prohibition of use proceed on the ground that the trade marks, as such, are invalid. The Cuban corporation which licensed petitioner to manufacture and sell Bacardi products and to use Bacardi trade marks had for many years sold its rum in Puerto Rico, although the rum was not manufactured there. There is no question of deception or unfair methods of competition. Petitioner is prohibited from the use of its trade marks, although valid and duly registered and although the product to which they are applied is otherwise lawfully made and the subject of lawful sale, solely because the marks had previously been used outside Puerto Rico and had not been used on spirits manufactured in Puerto Rico, or exclusively in continental United States, prior to February 1, 1936.

The first question thus presented is whether this discriminatory enactment conflicts with the General Inter-American Convention for Trade Mark and Commercial Protection signed at Washington on February 20, 1929.[7]

This treaty was the culmination of the efforts of many years to secure the coöperation of the American States in

[7] The Convention was ratified by the United States on February 11, 1931, and proclaimed February 27, 1931. 46 Stat. 2907. It was ratified by Cuba in 1930. Id., p. 2976. It has also been ratified by Colombia, Guatemala, Haiti, Honduras, Nicaragua, Panama and Peru. Bulletin, U. S. Trade-Mark Association, 1936, p. 174.

uniform trade mark protection. As previous Conventions had not proved satisfactory,[8] the Sixth International Conference of American States, held at Havana in 1928, recommended to the Governing Board of the Pan American Union the calling of a special conference "for the purpose of studying in its amplest scope the problem of the Inter-American protection of trade marks." Delegates from the respective States were appointed accordingly and from their proceedings the Convention of 1929 resulted. There were obvious difficulties to be surmounted. These inhered in the differences between the principles of trade mark protection in the Latin American countries, where the civil law is followed, and the common law principles obtaining in the United States. The Convention states that the Contracting States were "animated by the desire to reconcile the different juridical systems which prevail in the several American Republics" and resolved to negotiate the Convention "for the protection of trade marks, trade names, and for the repression of unfair competition and false indications of geographical origin."

By Chapter I, entitled "Equality of Citizens and Aliens as to Trade Mark and Commercial Protection," the respective Contracting States bind themselves to grant to the nationals of the other Contracting States the same rights and remedies which their laws extend to their own nationals.

By Chapter II, entitled "Trade Mark Protection," provision is made for registration or deposit of trade marks in the proper offices of the Contracting States. Article 3 then specifically provides:

"Every mark duly registered or legally protected in one of the Contracting States shall be admitted to registra-

---

[8] Ladas, "The International Protection of Trade Marks by the American Republics," pp. 11 *et seq.;* Derenberg, "Trade-Mark Protection and Unfair Trading," pp. 779 *et seq.*

tion or deposit and legally protected in the other Contracting States, upon compliance with the formal provisions of the domestic law of such States."

The grounds upon which registration or deposit may be refused or canceled are then set forth, including those cases where the distinguishing elements of marks infringe rights already acquired by another person in the country where registration or deposit is claimed, or where they lack an appropriate distinctive character, or offend public morals, etc. (Art. 3). It is further provided that labels, industrial designs and slogans used to identify or to advertise goods shall receive the same protection accorded to trade marks in countries where they are considered as such, upon compliance with the requirements of the domestic trade mark law (Art. 5). The owner of a mark protected in one of the Contracting States is permitted to oppose registration or deposit of an interfering mark (Art. 7); and the owner of a mark refused registration because of an interfering mark has the right to apply for and obtain the cancellation of the interfering mark on meeting stated requirements. (Art. 8.)

There is another provision that "the use and exploitation of trade marks may be transferred separately for each country" and properly recorded. (Art. 11.)

Chapter III provides for the "Protection of Commercial Names," Chapter IV for the "Repression of Unfair Competition," and Chapter V for the "Repression of False Indications of Geographical Origin or Source." The remaining chapters relate to remedies and contain general provisions. Among the latter is one to the effect that the provisions of the Convention "shall have the force of law in those States in which international treaties possess that character, as soon as they are ratified by their constitutional organs." An accompanying Protocol establishes an Inter-American Trade Mark Bureau where marks may be registered.

The text of the provisions above mentioned relating to the protection of trade marks is set forth in the margin.[9]

[9] "Chapter I. Equality of Citizens and Aliens as to Trade Mark and Commercial Protection.

"Article 1. The Contracting States bind themselves to grant to the nationals of the other Contracting States and to domiciled foreigners who own a manufacturing or commercial establishment or an agricultural development in any of the States which have ratified or adhered to the present Convention the same rights and remedies which their laws extend to their own nationals or domiciled persons with respect to trade marks, trade names, and the repression of unfair competition and false indications of geographical origin or source."

"Chapter II. Trade Mark Protection.

"Article 2. The person who desires to obtain protection for his marks in a country other than his own, in which this Convention is in force, can obtain protection either by applying directly to the proper office of the State in which he desires to obtain protection, or through the Inter-American Trade Mark Bureau referred to in the Protocol on the Inter-American Registration of Trade Marks, if this Protocol has been accepted by his country and the country in which he seeks protection."

"Article 3. Every mark duly registered or legally protected in one of the Contracting States shall be admitted to registration or deposit and legally protected in the other Contracting States, upon compliance with the formal provisions of the domestic law of such States.

"Registration or deposit may be refused or canceled of marks:

"1. The distinguishing elements of which infringe rights already acquired by another person in the country where registration or deposit is claimed.

"2. Which lack any distinctive character or consist exclusively of words, symbols, or signs which serve in trade to designate the class, kind, quality, quantity, use, value, place of origin of the products, time of production, or which are or have become at the time registration or deposit is sought, generic or usual terms in current language or in the commercial usage of the country where registration or deposit is sought, when the owner of the marks seeks to appropriate them as a distinguishing element of his mark.

"In determining the distinctive character of a mark, all the circumstances existing should be taken into account, particularly the

This treaty on ratification became a part of our law. No special legislation in the United States was necessary to make it effective. *Head Money Cases*, 112 U. S. 580,

duration of the use of the mark and if in fact it has acquired in the country where deposit, registration or protection is sought, a significance distinctive of the applicant's goods.

"3. Which offend public morals or which may be contrary to public order.

"4. Which tend to expose persons, institutions, beliefs, national symbols or those of associations of public interest, to ridicule or contempt.

"5. Which contain representations of racial types or scenes typical or characteristic of any of the Contracting States, other than that of the origin of the mark.

"6. Which have as a principal distinguishing element, phrases, names or slogans which constitute the trade name or an essential or characteristic part thereof, belonging to some person engaged in any of the other Contracting States in the manufacture, trade or production of articles or merchandise of the same class as that to which the mark applied." . . . .

"Article 5. Labels, industrial designs, slogans, prints, catalogues or advertisements used to identify or to advertise goods, shall receive the same protection accorded to trade marks in countries where they are considered as such, upon complying with the requirements of the domestic trade mark law." . . .

"Article 7. Any owner of a mark protected in one of the Contracting States in accordance with its domestic law, who may know that some other person is using or applying to register or deposit an interfering mark in any other of the Contracting States, shall have the right to oppose such use, registration or deposit and shall have the right to employ all legal means, procedure or recourse provided in the country in which such interfering mark is being used or where its registration or deposit is being sought, and upon proof that the person who is using such mark or applying to register or deposit it, had knowledge of the existence and continuous use in any of the Contracting States of the mark on which opposition is based upon goods of the same class, the opposer may claim for himself the preferential right to use such mark in the country where the opposition is made or priority to register or deposit it in such country, upon compliance with the requirements

598, 599; *Asakura* v. *Seattle,* 265 U. S. 332, 341. The treaty bound Puerto Rico and could not be overriden by the Puerto Rican legislature. *Asakura* v. *Seattle, supra;*

established by the domestic legislation in such country and by this Convention."

"Article 8. When the owner of a mark seeks the registration or deposit of the mark in a Contracting State other than that of origin of the mark and such registration or deposit is refused because of the previous registration or deposit of an interfering mark, he shall have the right to apply for and obtain the cancellation or annulment of the interfering mark upon proving, in accordance with the legal procedure of the country in which cancellation is sought, the stipulations in Paragraph (a) and those of either Paragraph (b) or (c) below:

"(a) That he enjoyed legal protection for his mark in another of the Contracting States prior to the date of the application for the registration or deposit which he seeks to cancel; and

"(b) that the claimant of the interfering mark, the cancellation of which is sought, had knowledge of the use, employment, registration or deposit in any of the Contracting States of the mark for the specific goods to which said interfering mark is applied, prior to adoption and use thereof or prior to the filing of the application or deposit of the mark which is sought to be cancelled; or

"(c) that the owner of the mark who seeks cancellation based on a prior right to the ownership and use of such mark, has traded or trades with or in the country in which cancellation is sought, and that goods designated by his mark have circulated and circulate in said country from a date prior to the filing of the application for registration or deposit for the mark, the cancellation which is claimed, or prior to the adoption and use of the same." . . .

"Article 11. The transfer of the ownership of a registered or deposited mark in the country of its original registration shall be effective and shall be recognized in the other Contracting States, provided that reliable proof be furnished that such transfer has been executed and registered in accordance with the internal law of the State in which such transfer took place. Such transfer shall be recorded in accordance with the legislation of the country in which it is to be effective.

"The use and exploitation of trade marks may be transferred separately for each country, and such transfer shall be recorded upon the production of reliable proof that such transfer has been

*Nielsen* v. *Johnson,* 279 U. S. 47, 52; *United States* v. *Belmont,* 301 U. S. 324, 331. According to the accepted canon, we should construe the treaty liberally to give effect to the purpose which animates it. Even where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred. *Jordan* v. *Tashiro,* 278 U. S. 123, 127; *Nielsen* v. *Johnson, supra; Factor* v. *Laubenheimer,* 290 U. S. 276, 293, 294.

Here, the clear purpose of the treaty is to protect the foreign trade marks which fall within the treaty's purview. The basic condition of that protection, as set forth in Article 3, is that the mark shall have been "duly registered or legally protected" in one of the Contracting States. This phrase shows the endeavor to reconcile the conflicting juridical principles of these States,—the words "or legally protected" being added to the words "duly registered" with the apparent intent to cover trade marks which were entitled under the common law to protection by reason of appropriation and use.[10] If duly registered or legally protected in one of the Contracting States, the mark is to be admitted to registration or deposit and is to be legally protected in the other Contracting States. The condition of that protection in the other States is compliance "with the formal provisions" of the domestic law. This clearly indicates that formalities or procedural requisites are envisaged and that, when these have been met, it is the intent of the treaty to confer a substantive right to the protection of the foreign mark. The intent to give this right of protection if the mark is entitled to registration under the treaty, is shown with

executed in accordance with the internal law of the State in which such transfer took place. Such transfer shall be recorded in accordance with the legislation of the country in which it is to be effective."

[10] Derenberg, *op cit.,* p. 788.

abundant clarity by the provisions of the same article setting forth the grounds, relating to infringement of previously acquired rights or lack of distinctive character, etc., upon which registration may be refused or canceled in the country where protection is sought. Also by the provisions as to the right of the owner of a mark protected in one of the Contracting States to oppose registration in another State of an interfering mark (Art. 7); and by the provisions as to the right of the owner of a mark, having its origin in one State and seeking registration in another, to obtain cancellation or annulment of an interfering mark which stands in the way of the registration sought, upon proving priority of right as stated. (Art. 8.) Then there is the additional recognition of the right to transfer the ownership of a registered mark and also to transfer separately for each country the use and exploitation of trade marks when the transfer is executed in accordance with the law of the place where it is made and is duly recorded. It will be observed that the right of protection of the foreign marks, on compliance with the prescribed formalities, is accorded in each of the ratifying States irrespective of citizenship or domicile.[11] When the foreign mark is entitled by virtue of the treaty to registration in a ratifying State, and is duly registered there, the substantive right to its protection in that State attaches.

In this view, the contention that a ratifying State, on due registration of a foreign mark in accordance with the treaty, is not bound to protect the owner in the use of that mark provided it refuses that protection to its own nationals necessarily fails. Undoubtedly the Contracting States are bound respectively to give to the nationals of the other Contracting States the same rights and remedies that are extended to their own nationals.

---

[11] See Bulletin, U. S. Trade Mark Association, 1931, p. 173; Derenberg, *op. cit.*, p. 788.

That is provided in Article 1. But that provision does
not exhaust the rights given by the treaty. These rights
under Article 3 extend to the legal protection of the for-
eign marks when duly registered. When protection is
sought for such marks a ratifying State cannot escape the
obligations of the treaty and deny protection by the sim-
ple device of embracing its own nationals in that denial.
That would make a mockery of the treaty. It is its
plain purpose to prevent a ratifying State from denying
protection to the foreign mark because of its origin or
previous registration in a foreign country. It is said that
the object of the treaty is to prevent piracy. That is
true, but the argument does not meet the issue. Pro-
tection against piracy necessarily presupposes the right
to use the marks thus protected.

We are here concerned with the construction of the
treaty only as it involves the determination of the valid-
ity of the statutory discrimination against the foreign
marks which have been duly registered in the United
States and Puerto Rico. The Bacardi marks are of Cuban
origin. We must assume upon this record that they
were duly registered and were valid in Cuba. Both the
United States and Cuba have ratified the treaty.[12] The
right of the Cuban corporation which owned the marks
to make a separate transfer to petitioner of the right
to use and exploit them in Puerto Rico is recognized by
the treaty. Despite this, Puerto Rico has attempted to
deny the right to use these marks on rum manufactured
in Puerto Rico for the sole reason that the marks had
been used outside Puerto Rico and had not been used on
spirits made there, or exclusively in continental United
States, before the given date. That is, the very fact of

---

[12] The Solicitor General has submitted to the Court a communica-
tion by the Cuban Embassy in Washington to the Secretary of
State of the United States relating to the interest of Cuban nationals
and the Cuban Government in the question here presented.

origin in Cuba, which makes the treaty applicable, is asserted as a ground for denying the right to use the trade marks, duly registered, on a product otherwise lawfully manufactured in Puerto Rico.

That Puerto Rico makes its rule applicable to its own citizens who may possess such foreign marks cannot avail to purge the discrimination of its hostility to the treaty. The same reasoning, if admitted to sustain this particular discrimination, would justify as against the treaty a local statute denying the right to use, in Puerto Rico any foreign trade mark in any circumstances.

The exigencies of local trade and manufacture which prompted the enactment of the statute cannot save it, as the United States in exercising its treaty making power dominates local policy.

We are not impressed by the argument that petitioner is estopped by acts of acquiescence to challenge the validity of the Puerto Rican legislation. It is said that petitioner, having accepted the privilege to engage in the local business, is bound by the prescribed conditions. The basis of the contention fails. It does not appear that petitioner applied for a permit under the Act of 1937 which is the subject of attack. Petitioner did apply, on March 31, 1936, for a permit to engage in the business of rectifying distilled spirits. At that time the legislation of Puerto Rico did not discriminate against petitioner's trade marks, and the legislation of May 15, 1936, was of a temporary character. Apart from that, it is not the right to manufacture, aside from the use of trade marks, that is in dispute here but the right to use petitioner's trade marks upon its product. Nothing has been shown to warrant a finding of estoppel to assert the invalidity of the discrimination thus attempted in violation of the treaty. *W. W. Cargill Co.* v. *Minnesota*, 180 U. S. 452, 468; *Hanover Fire Insurance Co.* v. *Harding*, 272 U. S.

494, 507; *Power Manufacturing Co.* v. *Saunders,* 274 U. S. 490, 497; *Frost* v. *Corporation Commission,* 278 U. S. 515, 527, 528.

We conclude that, upon this ground of repugnance to the treaty, the decree of the District Court insofar as it enjoined the enforcement of § 44 of Act No. 6 of June 30, 1936, as amended by Act No. 149 of May 15, 1937, (including the amendment made by § 7 of that Act) with respect to petitioner's trade marks, was right, and that the reversal in that relation by the Circuit Court of Appeals was erroneous.

We have no occasion to consider the other grounds of objection to § 44 which have been urged under the Constitution and laws of the United States and the Organic Act of Puerto Rico.

A different situation is presented with respect to § 44 (b) of Act No. 149 of 1937, prohibiting bulk shipments of distilled spirits. This prohibition does not appear to offend any right conferred by the treaty and we think an adequate basis for it is found in the police power of Puerto Rico as applied to traffic in intoxicating liquors. We have recently said that "The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination, with an autonomy similar to that of the states and incorporated territories." *Puerto Rico* v. *Shell Company,* 302 U. S. 253, 261, 262. See, also, *Puerto Rico* v. *Rubert Hermanos,* 309 U. S. 543, 547. As the grant of legislative power in respect of local matters was "as broad and comprehensive as language could make it" (*Puerto Rico* v. *Shell Company, supra*), we think the legislature of Puerto Rico in the exercise of its police power had full authority to deal with the manufacture of, and traffic in, intoxicating liquors, so far as the Island was affected, in the absence of a treaty violation such as we have found in the prohibition of the use of

valid trade marks upon liquors which were otherwise permitted to be manufactured and sold. The legislature of Puerto Rico could thus have absolutely interdicted the manufacture or sale (*Mugler* v. *Kansas,* 123 U. S. 623), the importation into the Island (*State Board of Equalization* v. *Young's Market Co.,* 299 U. S. 59, 62; *Mahoney* v. *Joseph Triner Corp.,* 304 U. S. 401, 404) and the exportation from the Island. *Ziffrin* v. *Reeves,* 308 U. S. 132, 139. Having this power, the legislature of Puerto Rico could adopt measures reasonably appropriate to carry out its inhibitions. That broad power necessarily embraced the limited exercise which we find in § 44 (b) with respect to shipments in bulk. Nor do we find anything in the Federal Alcohol Administration Act which militates against that provision. The Circuit Court of Appeals did not err in its decision in this respect.

The decree of the Circuit Court of Appeals in relation to § 44 is reversed and the decree of the District Court is modified so as to eliminate the injunction against the enforcement of § 40 [13] and § 44 (b) of Act No. 149 of May 15, 1937, and as thus modified is affirmed.

*It is so ordered.*

---

[13] Section 40 was embraced in the decree of the District Court but is not the subject of attack in this Court.