KoolVent Metal Awning Corporation of America, Appellant, *v.* Price.

Argued October 3, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*Coleman Harrison,* for appellants.

*Julian Miller,* with him *Brown, Critchlow, Flick & Peckham,* for appellee.

OPINION BY MR. JUSTICE BELL, November 15, 1951:

Plaintiff, manufacturer of KoolVent Aluminum Awnings, filed a bill in equity to enjoin defendant from using the name "Cool-Ray" in the sale of aluminum awnings and from persisting in unfair trade practices and for an accounting and damages. The chancellor, after hearing, dismissed the bill. The case turns on two narrow questions: Had the plaintiff's trade name or trade-mark acquired a special or secondary meaning; and if so, was defendant's name or practices so similar to plaintiff's as reasonably likely to confuse or deceive the public?

The chancellor found, upon adequate evidence, the following facts: KoolVent Metal Awning Corporation is a Pennsylvania corporation which was chartered October 26, 1944, and has patented the trade-mark "Kool-Vent" which it registered with the Secretary of the Commonwealth of Pennsylvania on November 12, 1947. It has advertised its products extensively nationally, as well as locally in Allegheny County. Defendant was engaged in the business of selling and installing building materials and equipment, bathroom fixtures, and, since March 1949, has sold aluminum awnings. The name "Cool-Ray" was adopted by the manufacturer and both it and the defendant knew of KoolVent awnings prior to the adoption of the name "Cool-Ray". Defend-

ant advertises Cool-Ray awnings locally in newspapers, periodicals and brochures. Other metal awnings of similar design and construction are advertised for sale in Allegheny County under various names, such as "Breeze", "Breezeway", etc. The prefix "cool" or "kool" is widely used. It appears from Thomas' Register of American Manufacturers, that the word *"Koolhome"* was registered as a trade name in connection with *awnings in 1940,* although never sold in Allegheny County; the word "Coolvent" has been used by manufacturers of attic fans; "Cool Vent" by manufacturers of piston rings; and "Cool-A-Vent" was registered as a trademark for window ventilators in 1939. There are more than fifty other products patented with the name "Cool" or "Kool" as a prefix or part of a name, which are in use in other parts of the country.

The plaintiff laid particular stress on the vent as a unique part or characteristic of their product; the Cool-Ray awnings have no vent and do not have a similar appearance. The names do not look or sound alike and create no confusion. The first letter is of course different; the form of the letter is different, one being block and the other script; the word "KoolVent" has a mark over the top of each word; the word "Cool-Ray" is hyphenated; and they neither appear nor are pronounced nor sound alike. "The word 'Cool' is appropriate for and commonly used in the sale of awnings, regardless of type or substance." The word "cool" is a generic word of common and widespread usage; "both [names or trade-marks] suggest a quality generally applied to awnings, i.e., coolness. However, this feature is distinguishable by the last part of each name; vent indicating that the coolness is by ventilation and ray indicating that the awning itself cools the sun's rays without indicating in what particular way this is accomplished." There is a high degree of care exercised by purchasers of each product, since the articles are

expensive and are bought only after negotiation, measurements, and considerable attention.

In all of defendant's advertisements the name "Gutbro Construction Company" is prominently displayed, and the chancellor specifically found that "the *defendant did not intend* to cause confusion in the minds of the buying public or to defraud plaintiffs". Furthermore, *"there was no evidence that the name 'Cool-Ray' was so similar to the name or trade-mark 'KoolVent' as to cause confusion in the minds of the purchasing public".*

Plaintiff is attempting to assert its rights, not in the word "Kool" alone, but in the name "KoolVent" *in its entirety. There was no evidence that anyone had been confused by the use of the name Cool-Ray or by defendant's conduct or practices.* To these findings by the chancellor, we may add that unless advertising created of itself and without any further proof, a secondary meaning in the mind of the public *so as to connect and identify* "KoolVent" awnings *with the manufacturer,* there was no evidence to justify the chancellor's finding that a secondary meaning had been established by plaintiffs.

The law in this class of cases is well established; its application to different facts and circumstances is sometimes difficult. *Descriptive, geographical and generic words, as well as words of common or general usage* belong to the public and *are not capable of exclusive appropriation by* anyone. This general principle is subject to the limitation or exception that if a trade name or trade-mark or other word or words have acquired, *in the trade and in the minds of the purchasing public,* a special or so-called secondary meaning, i.e., have come to mean that the article is the product of a certain manufacturer or of a particular indi-

---

* Italics throughout, ours.

vidual or corporation, such trade name or trade-mark or word or words will be protected against infringement: *Quaker State Oil v. Steinberg,* 325 Pa. 273, 189 A. 473; *Kellogg Co. v. National Biscuit Co.,* 305 U. S. 111; *Thomson-Porcelite Co. v. Harad,* 356 Pa. 121, 51 A. 2d 605; *Stroehmann Brothers Co. v. Manbeck Baking Co.,* 331 Pa. 96, 200 A. 97. Even though a word or phrase or mark has acquired a special or secondary meaning, *the right of protection does not extend a monopoly to every word in the name,* but the protection will be afforded only against names or marks which are deceptively similar thereto and consequently are likely to confuse the public: *Quaker State Oil v. Steinberg,* 325 Pa., supra. Moreover, a trade name or trademark which has acquired a secondary meaning is entitled to the protection of equity even though it may be unregistered or incapable of being registered: *Hub Clothing Co. v. Cohen,* 270 Pa. 487, 113 A. 677; *E. T. Fraim Lock Co. v. Shimer,* 43 Pa. Superior Ct. 221; *National NuGrape Co. v. Guest,* 164 F. 2d 874.

In determining whether a trade name or trade-mark has been infringed the courts take into consideration these factors: (1) The degree of similarity between the trade names or trade-marks or labels in appearance, pronunciation or sound, and in the verbal translation of the pictures or designs involved; (2) The actual intent of the party allegedly guilty of infringement; (3) The nature of the articles and the use for which they are intended, as well as the manner of production or marketing or advertising thereof; and (4) The degree of care likely to be exercised by purchasers. Cf. *Thomson-Porcelite Co. v. Harad,* 356 Pa. 121, 124, 51 A. 2d 605; Restatement, Torts, §729.

While the chancellor found as a fact that there was no intent to deceive, an actual intent to deceive is not indispensable: *American Clay Mfg. Co. v. American Clay Mfg. Co.,* 198 Pa. 189, 47 A. 936. All that is nec-

essary is that the court shall find from the evidence that the name or mark or label, or the conduct and practices of the defendant *actually* confused and *deceived or that it is reasonably likely that the average purchaser will be deceived;* possibility that purchasers will be misled is not enough: *Stroehmann Brothers Co. v. Manbeck Baking Co.,* 331 Pa. 96, 98, 200 A. 97; *Thomson-Porcelite Co. v. Harad,* 356 Pa. 121, 51 A. 2d 605; *Quaker State Oil v. Steinberg,* 325 Pa. 273, 189 A. 473.

The chancellor found as a fact that there was no evidence in this case that anyone had been confused or deceived by the use of the name "Cool-Ray" or by the conduct or practices of the defendant. Moreover, the court en banc, in an opinion by the chancellor, correctly decided that if Mrs. Heymann, plaintiff's only witness as to the alleged confusion "is to be accepted as a typical example of the buying public, the Chancellor would not have been justified in his finding that the name KoolVent had developed a secondary meaning, for insofar as Mrs. Heyman was concerned, it had not." The only basis on which a court could find in this case that the word "KoolVent" had acquired a secondary meaning, i.e., to mean the product of the particular manufacturer as distinguished from aluminum awnings or awnings in general, arises from the extensive national and substantial local advertising of the plaintiff over a period of several years. This is not sufficient: *Quaker State Oil v. Steinberg,* 325 Pa. 273.

*Quaker State Oil v. Steinberg* is on its facts the closest authority to the present case and rules it in favor of the defendant. In that case, this Court refused to enjoin, at the complaint of the Quaker State Oil Refining Company, the use of a trade name "Quaker City" by the defendant, Quaker City Oil Refining Company, nothwithstanding the fact that the plaintiff had over 70,000 dealers handling its oil and its annual sales

exceeded ten million gallons and that it had been engaged in extensive advertisement of its trade name "Quaker State" for many years. The law is clearly stated by Justice, later Chief Justice, SCHAFFER in a very able and comprehensive opinion, from which we quote the following " '. . . the word Quaker [State] is a descriptive term not capable of exclusive appropriation by anyone and . . . it may be used by the world at large in . . . [a] non-deceptive way. . . .'

"If, however, the geographical term has taken on a secondary meaning it will be protected. . . . 'There is nothing abstruse or complicated about this theory, however difficult its application may sometimes be. It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article, that in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark. So it was said that the word had come to have a secondary meaning, although this phrase, "secondary meaning," seems not happily chosen, because, in the limited field, this new meaning is primary rather than secondary; that is to say, it is, in that field, the natural meaning.' . . .

"The only evidence from which it could be inferred that the name of complainant's product had acquired a secondary meaning prior to 1919 is that *its product has been marketed and had been nationally advertised for five years under this name.* There is no other evidence from which it could be inferred that the public associated 'Quaker State' or 'Quaker' with the complainant's product at that time. *'The mere adoption and use of words in advertisements, circulars and price*

*lists and on signs and stationery give no exclusive right to their use*: DeLong Hook & Eye Co. v. Hump Hairpin Mfg. Co., 297 Ill. 359, 364, 130 N. E. 765. See also Continental Corp. v. National Union Radio Corp., 67 F. (2) 938, 942. *'It is an accepted principle of the common law that mere advertising is insufficient to establish trade-mark use*': Derenberg, supra, p. 505.

"But even if it be assumed that the words 'Quaker State' acquired a secondary meaning in 1919, it will not help the complainant's case. *The defendant can only be enjoined from the use of the name 'Quaker City' if it is deceptively similar thereto*: Celluloid Mfg. Co. v. Cellonite Mfg. Co., 32 Fed. 94. There is nothing in the names 'Quaker State' and 'Quaker City' that should confuse the purchasing public. . . . A similar situation arose over the right to use the words 'Quaker City' and 'Quaker Maid' as applied to candy. In that case it was said: 'The defendant introduced no evidence that these trade-marks are confusing because of similarity. In other words, it did not attempt to prove that the trade has ever been confused by the marks or that purchasers have ever mistaken one for the other, or have mistaken the wares they mark, a situation which at first induces one's mind to conclude that the ground for opposition is not tenable. Therefore, we must determine from the trade-marks themselves whether they resemble each other so closely that confusion or mistake in the mind of the public will likely occur.' . . .

"In Caron Corporation v. Conde, 126 Misc. (N.Y.) 676, 677, 213 N. Y. S. 735, affirmed 220 App. Div. 835, 222 N. Y. S. 782, it was said: 'The plaintiff does not use the word "narcissus," but the words "narcisse noir," namely "black narcissus." . . . *A phrase or combination of words may be entitled to absolute protection, while the use of its component parts separately may be open to every one.* Assuming that plaintiff is entitled to the sole use of the phrase "black narcissus" or any

colorable imitation thereof, it by no means follows that he has any right to prevent the use of the word "narcissus" alone.' . . .

"If it had been shown that the defendants were endeavoring to palm off their product as plaintiff's, a different situation would exist and relief would be granted. Nothing of that kind was attempted to be established. All that appeared was that occasionally some purchaser did not differentiate between 'Quaker State' and 'Quaker City' when inquiring for or purchasing oil."

Another case in point is *Kellogg Co. v. National Biscuit Co.,* 305 U. S. 111. Plaintiff had been manufacturing and selling *shredded wheat* under a patent for 10 years and had spent $17,000,000. to extensively advertise it. When the patent ran out the defendant attempted to make and sell *shredded wheat* and to make it *in the same pillow shaped form* in which plaintiff had made it for 10 years. The Supreme Court refused an injunction and in an opinion by Justice BRANDEIS said (page 116) : "The plaintiff has no exclusive right to the use of the term 'Shredded Wheat' as a trade name. For that is the generic term of the article, which describes it with a fair degree of accuracy; and is the term by which the biscuit in pillow-shaped form is generally known by the public. Since the term is generic, the original maker of the product acquired no exclusive right to use it. . . . But to establish a trade name in the term 'shredded wheat' [and hence a special or secondary meaning] the plaintiff must show more than a subordinate meaning which applies to it. *It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer.* This it has not done."

*Thomson-Porcelite Co. v. Harad,* 356 Pa. 121, 51 A. 2d 605, which was especially relied upon by the appellant, is on its facts clearly distinguishable. The Court

held that the word "Porcelite", a coined name, (1) had become identified *as the plaintiff's product* by 40 years' use and association by the public of that name with plaintiff's product and it had thereby acquired a secondary meaning; and (2) the pronunciation of the name, the labels, the surrounding circumstances, (even paint salesmen mistook defendant's product for plaintiff's product) were confusingly similar to the plaintiff's trade-mark or trade name.

All of the other authorities cited by appellant are on their particular facts clearly distinguishable.

We therefore hold that even if it be assumed, arguendo, that the name KoolVent had acquired a special or secondary meaning, as to which there was no adequate evidence, the buying public would not have been deceived by the use of the name Cool-Ray, nor by any practices which the defendant has followed.

Decree affirmed at appellant's cost.

Mr. Chief Justice DREW and Mr. Justice HORACE STERN dissent.