39 C.C.P.A. (Patents)

## BROWN–BROCKMEYER CO. v. WESTINGHOUSE ELECTRIC CORP.

### Patent Appeals No. 5886.

United States Court of Customs
and Patent Appeals.

June 24, 1952.

O'Connell, J., dissented.

Toulmin & Toulmin, Dayton, Ohio (H. A. Toulmin, Jr., and H. H. Brown, Dayton, Ohio, of counsel), for appellant.

James Atkins, Washington, D. C. (G. M. Crawford, Pittsburgh, Pa., and Arthur Stewart, Baltimore, Md., of counsel), for appellee.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and JACKSON, Associate Judges.

JACKSON, Judge.

This is an appeal in an opposition proceeding under the Trade-Mark Act of 1946, 15 U.S.C.A. § 1051 et seq., from a decision of an Examiner-in-Chief of the United States Patent Office, 89 U.S.P.Q. 169, reversing a decision of the Examiner of Trade-Mark Interferences sustaining an opposition filed by appellant against the registration of appellee's trade-mark and adjudging that such mark is not entitled to registration.

The mark disclosed in the application of appellee consists of the notation "Life-Line" with slanted letters, the first of which is composed of a larger "L" than the "L" in the second word and with a bar extending under all of the letters except the first. The application, serial No. 532,893, was filed August 29, 1947, as applied to "Electric Motors." It is alleged in the application that first use of the mark was on April 16, 1946, and its first use in interstate commerce on July 22, 1946.

In its notice of opposition dated August 24, 1948, appellant alleges it is the owner of the trade-mark "B-Line," registered July 13, 1926 and renewed in 1946, No. 215,-250, as applied to "Electrical Motors." It is further alleged that the goods of the respective parties to which their marks are applied are of the same descriptive properties and that their concurrent use would be likely to cause confusion or mistake in the minds of the trade or public or deceive purchasers and appellant would be damaged by the use or registration of appellee's mark.

The Examiner of Interferences noted the concession of appellee that appellant is the prior user of its mark. He further noted that no testimony was taken by appellee and that appellant is entitled to priority in the use of the trade-mark "Line" and "Truly Life-Time Motors," allegedly used on electrical motors prior to the filing date of appellee. The examiner stated that the only allegation of priority of use by appellant pleaded in its notice of opposition is the mark "B-Line" and therefore held that the only question for determination is whether the concurrent use by the parties of their respective marks "B-Line" and "Life-Line" on the same kind of goods is likely to be the source of confusion or mistake or deceive purchasers. It was the opinion of the examiner that the word "line" is the dominant part of the mark of appellant and therefore there would be like-

lihood of confusion if that word were used by another with another letter of the alphabet substituted for the letter "B." While he observed that the substitution of the word "life" for the letter "B" in some respects distinguished the marks he was of opinion that in other respects the likelihood of confusion is increased by the suggestion that when the goods are sold side by side or advertised through the same advertising media they had the same origin and that those marked "Life-Line" are of superior quality. Considering the marks as a whole the examiner was of opinion that there is likelihood of confusion and mistake if the respective marks of the parties are used concurrently on like products, citing Auburn Rubber Corp. v. Hanover Rubber Co., 107 F.2d 558, 27 C.C.P.A., Patents, 743; Lever Bros. Co. v. The Sitroux Co., Inc., 109 F.2d 445, 27 C.C.P.A., Patents, 858. In the former of those cases the conflicting marks were the numeral "2" over the word "Life" and "Nu-Life"; and in the latter case, the competing marks were "Sitru-lux" and "Lux."

The Examiner-in-Chief observed that the only question properly involved is that of confusing similarity of the respective marks of the parties. He stated that appellant adopted the word "line" as one of its marks and applied for its registration on November 22, 1947; that it obtained registration on the Supplemental Register of the expression "Truly Life-Time Motors" dated August 5, 1947, registration No. 508,311; that the latter registration states the date of first use of the mark to be August 6, 1947, and used in the form of "Truly A Life-Time Motor" in February, 1947. The Examiner-in-Chief also noted that appellant refers to the copyright of the latter phrase and stated that it had reference to a copyrighted advertisement in which the phrase appeared but not of any date earlier than those alleged in the registration.

The Examiner-in-Chief considered that the testimony and arguments on behalf of appellant involving the mark "line" and the phrase "Truly A Life-Time Motor" were improper for the reason that the only mark relied on in the notice of opposition is the trade-mark "B-Line." There is nothing in the notice of opposition concerning the mark "Line" or the expression "Truly A Life-Time Motor" and no claim of prior use was made as to those marks in the notice. Therefore, he held that it cannot be assumed that appellant's use of those two expressions was prior to appellee's use of his mark. He further stated that even if it be admitted, for the sake of argument, that appellant could rely upon the use of those expressions which were not pleaded, it would still have upon it the burden of proving that their use was prior. There is nothing in the record to establish that such use was prior to the use by appellee of its mark and the Examiner-in-Chief stated that "in fact, the record strongly suggests that opposer adopted the two expressions after and with knowledge of applicant's activities."

The Examiner-in-Chief disagreed with the Examiner of Interferences who held that the word "line" is the dominant feature of appellant's mark. In that connection he stated that merely because the word "line" appears at the end of each of the marks there is no reason for it being considered as the dominant feature and that simply because the last syllable of appellant's mark occupies more space than the first syllable does not render the word "line" its dominant feature.

The Examiner-in-Chief held, and properly so we think, that the relative numbers of letters are not of moment in the two syllables, and he stated that it could be equally well argued that "B" is the dominant feature of appellant's mark because it appears first in place.

It is stated in the decision of the Examiner-in-Chief that the usage of appellant's involved mark in its various exhibits and advertisements discloses that "B" is always associated with "line." He noted that the mark at times is written entirely in capitals, at other times in capital and lower case letters, and in the latter event occasionally in script. He observed that many advertisements of appellant carry a seal or monogram device with the "B" appearing as a large capital letter and the word "line" appearing in small letters beneath or at the line.

In the opinion of the Examiner-in-Chief the word "line" in the combination "B-Line" is either of equal significance to the letter "B" or of less significance, but not dominant over the letter section of the mark with respect to its appearance and usage. He also properly stated that the meaning of the word "line" in commerce indicates it is only a subordinate part of the mark in a combination such as that of appellant.

The Examiner-in-Chief was of opinion that there is no likelihood of confusion or mistake or deception of purchasers in the concurrent use by the parties of their respective marks and on the goods to which they apply. He did not consider the Auburn Rubber Corp. case, supra, which was cited by the Examiner of Interferences, to be in point for the reason that there, one mark was "2-Life" and the other "Nu-Life," which not only had a common final syllable but the first syllables in the marks were similar in sound. In the instant case we find no similarity of sound or meaning in the first syllables of the respective marks.

The Examiner-in-Chief pointed out that counsel for appellant attempted to show instances of actual confusion between the marks. One of those was a letter received by appellant from someone in China who owned a number of appellant's motors. A statement in that letter reads "What means B-Line? Is it means second class quality?" We agree with the Examiner-in-Chief that if any confusion is shown in that letter it is in the meaning of appellant's trade-mark.

Apparently, the Chinese gentleman knew enough English to understand the commercial meaning of the word "line" and also that the letter "B" is used to indicate second-grade goods. Therefore, we find nothing in the letter to suggest any confusion as to origin or that the mind of the writer was confused, but, if it were, it was caused by the use appellant made of its mark.

We find no evidence that there was any confusion shown in the record caused by appellee's use of the mark, nor is there any suggestion of any confusion as to the origin of its goods.

It was also contended that by reason of certain allegedly similar advertisements confusion is emphasized. Those advertisements consist of one placed by appellant in November 1946 in the Machine Design and Electrical Manufacturing and an advertisement of appellee which appears in The Iron Age of September 11, 1947. Both advertisements, of course, relate to electric motors, have three illustrations, and have the name of the producing company at the bottom thereof, but any other resemblance is very remote and of no consequence.

As we view it, the expressions do not look alike, do not sound alike, nor have they the same meaning.

For the reasons hereinbefore set out we think that appellee is entitled to the registration of its mark and we are in accord with the succinct decision of the Examiner-in-Chief. The decision appealed from is *affirmed*.

Affirmed.

JACKSON, Judge, retired, was recalled to participate herein.

O'CONNELL, Judge (dissenting).

Westinghouse properly concedes here in its brief that while the primary test with regard to the confusing similarity of trademarks attached to competing merchandise involves a consideration of the respective marks as a whole, nevertheless it is permissible and often necessary to dissect the marks in order to disclose prohibited descriptiveness or likelihood of confusion which otherwise may not be apparent.[1]

Westinghouse presenting its argument on the foregoing assumption contends that the only point of similarity between the involved marks, the suffix "Line," is nowise descriptive of the electric motors in issue,[2]

1. Citing Firestone Tire & Rubber Co. v. Montgomery Ward & Co., Inc., 150 F. 2d 439, 32 C.C.P.A.,Patents, 1074; Franco-Italian Packing Corp. v. Van Camp Sea Food Co., Inc., 142 F.2d 274, 31 C.C.P.A.,Patents, 1029. See also Frankfort Distilleries, Inc. v. Kasko Distillers Prod. Corp., 111 F.2d 481, 27 C.C.P.A.,Patents, 1189, 1190.

2. In its application for registration, Westinghouse took the following stand in the successful rebuttal of the examiner's re-

is not the dominant feature of either mark, and does not render the marks, as a whole, confusingly similar, because the ordinary purchaser would attach little importance to "Line" when both marks are concurrently used on electric motors identical in kind.

The record, however, does not support Westinghouse. As the Examiner of Trade-Mark Interferences in his decision aptly put it:

"It is the examiner's opinion that the word 'Line' is the dominant part of opposer's mark. Certainly there would be likelihood of confusion if this dominant part were used by someone else and another letter of the alphabet were substituted for the letter 'B'. The substitution of the word 'Life' for the letter 'B', in some respects, makes the marks involved more distinguishable, but in other respects increases the likelihood of confusion by suggesting, when the goods are sold side by side or advertised through the same advertising media, that both goods have the same origin, and that those marked 'Life-Line' are of superior quality. Considering the marks as a whole, the examiner is of the opinion that there is likelihood of confusion and mistake if the respective marks are used concurrently on the same products."

The record discloses that the identical goods of the parties are not only sold side by side but also have been advertised simultaneously in the same class of advertising mediums since the recent entry of Westinghouse into the field. There is no dispute that as a matter of fact, and as established by the evidence of record, the letter "B" in appellant's mark "B-Line" is the initial for the individual surnames of Brown and Brockmeyer.

Appellant's opposition rests on the basis that the concurrent use of the respective marks on the same goods, sold side by side and simultaneously advertised in the same mediums of trade, is likely to cause purchasers to believe that appellant's "B-Line" motor is a second grade motor, the first grade being appellee's "Life-Line" motor.

In support of that contention, among other things, appellant submitted a letter from China, which so far as pertinent reads:

"Lee Hsing Textile Factory
"Wusih China, Aug. 19, 1848 [1948]
"The Brown-Brockmeyer Co.
"Dayton, O. U. S. A.
"Messrs:
"We have bought a number of your motors, include:

Type PM 10 HP 1450 R.P.M. for Ring Frame

Type PM 5 HP 1450 R.P.M. for Roving

Type PM 3 HP 1450 R.P.M. For Winding

all B-Line quality, from U.N.N.R. nine months ago. What means B-Line? Is it means second class quality? The running condition is good. But with our old opinion, the installed ball bearing arrangement doubted us, * * *.

" * * * We are confused, please direct us some opinion, and the proper operating method for your motors, very thanks.

"Yours truly,
"Wang Shi An.
Mec. & Ele. Dept.
"Lee Hsing Textile Factory"

In reply to the customer, appellant, among other things, replied:

"Dear Sir:
"We were interested to learn from your letter of August 19th that you

---

quest for disclaimer of "Line" on the ground that it is descriptive of applicant's goods:

" * * * Applicant's mark is used on electric motors and it is not seen how the term 'Line' can possibly be held to describe these motors. In trade or commerce the term *line* is used to designate a supply or stock of various qualities and values of the same general class of articles. The term *line*, however, is never used to describe the particular goods constituting the line. Such term is no more descriptive of electric motors than of women's dresses. In other words, the term *line* is snyonymous with the term *class*." (Italics quoted.)

purchased a number of three, five and ten horsepower B-Line motors through U.N.N.R.A. and that you are satisfied with their performance. * * *

"B-Line is our trade-name and not a quality classification. All B-Line products are first quality products designed and produced in thoroughly modern plants by expert motor craftsmen. Illustrated circulars on our motors and grinders are enclosed for your information. * * *"

More vital to the essential issue in this case, however, is the following excerpt from Brown-Brockmeyer's Exhibit 12 of record, consisting, among other things, of a letter from their Los Angeles representative, the Kuhn Company, indicating that the Requisition Officer for the United States Navy at Inyokern had withheld the placing of orders for appellant's motors on the ground that such motors were not "Class A" motors. In the letter of May 31, 1949, Kuhn, so far as pertinent, wrote:

"This letter is in further reference to the several invitations outstanding on bids issued from the Inyokern office of the Navy.

"When I called on them Wednesday regarding the bids, I was told off the record that the Navy did not know what to do about the bids since the Brown-Brockmeyer Company were low on items in each bid. Since they did not consider our motors to have enough 'quality' and were not 'rugged' enough to stand the desert temperatures of Inyokern they did not issue orders and did not know how to issue them without giving them to Brown-Brockmeyer. I was asked why we were furnishing B-Line quality motors since they wanted first class motors and thought we should give them A-Line motors. They said 'You know how good a "B" motion picture usually is—no good'. I explained that B-Line had nothing to do with the product being second quality. Incidentally, we get a lot of comment on the name B-Line in this regard."

More correspondence and telegrams on the same point addressed in protest by ap-

pellant to the officer of the Navy in charge of the purchasing of supplies are part of the record here, together with the following significant and unrefuted testimony given by Stephen A. Brown, president of the appellant company in response to the questioning of counsel:

"Q. 82. As far as you know, has any other company ever used the word 'Line' in connection with electric motors prior to your adoption of it as early as 1926? A. No, I know of no one having used the word 'Line.' It was just an arbitrary word we used with the 'B' in order to get the trademark when used in connection with motors.

"Q. 83. Has anyone used the word 'Line' in connection with motors until Westinghouse came out with this trademark, in 1946 of 'Life-Line'? A. I don't know of anybody. I have never seen it used in connection with motors to my knowledge.

"Q. 84. Did you have any competition from any other motor manufacturer, with the use of the word 'Line' or 'B-Line,' between the period of your first adoption of it in 1926 and the time when Westinghouse adopted 'Life-Line' in 1946? A. I know of no competition from any other motor company using the word 'Line' from the time that we started in business in 1925 up to the time Westinghouse started to use the word 'Life-Line.'

*     *     *     *     *     *

"Q. 88. The fact that the word 'Line' is the predominating word in the Westinghouse mark 'Life-Line,' as you have so testified, what effect did this have on your business and your customers? A. As I look on the word 'Life-Line,' the word 'Line,' as far as I am concerned, means motors. We have spent about a quarter of a century building up that word, and that has given us a great deal of prestige and good will. The word 'Life,' as far as I can understand, means longevity, and on that basis I would say that 'Life-Line' means a Class A motor.

"If Westinghouse is building a Class A motor and we are advertising a 'B-Line' motor, it seems to me that Westinghouse is getting a free ride. As a matter of fact, ever since Westinghouse has started to use the word 'Life-Line' we have had complaints come in to us where customers have graded our motors as a 'B-Line' quality. We never had those complaints before, as long as we have been in business, never had any complaints like that before. The result has been that we have lost business, we have lost prestige.

"We are definitely not building a poor product; our product is better today than it has ever been, especially since you (Glancing at counsel for Applicant)[3] have introduced this trade-mark. We have expended more money in machines, in improving our product, and more money in inspection than before you introduced the trade-mark 'Life-Line.' But still we are getting these complaints whereby our motors are being graded as 'B-Line' motors—B Grade motors. Now, whether it is intentional or unintentional on your part—on the part of Westinghouse—or whether it is a psychological reaction from the public in general, I don't know. But it has hurt us tremendously."

The record is replete with additional testimony of a similar nature submitted on the part of appellant. For example, the witness, David C. Benning, retired postal supervisor who handled appellant's mail at Dayton, Ohio, told how customers from time to time over a period of years addressed mail to appellant merely as the "Line Company," or as "Line, Inc." The law has long been settled that where the purchasing public has given a product a name other than its registered trade-name, such as "Koke" for "Coca-Cola," one who appropriates such a nickname for use on identical goods, regardless of fraudulent intent on proof of actual injury, is guilty of unfair competition against which protection by injunction will be granted. Coca-Cola Co. v. Koke Co., 254 U.S. 143, 41 S.Ct. 113, 65 L.Ed. 189; Coca-Cola Co. v. Boas, D.C., 27 F.2d 756; The Coca-Cola Company v. China Finance Corporation, U.S.Ct.China, 42 U.S.P.Q. 108.

Industrious efforts made by appellant to prevent the spoilation of its reputation and good will caused by the advent into the field of Westinghouse with its accused trade-mark are disclosed in the record. Concededly the electric motor marketed by each of the parties is of the highest quality, yet appellant has not been able to counteract the degrading influence caused by Westinghouse. The confusion by which appellant's customers have been diverted and by which its business may ultimately meet disaster emanates from the destructive force of the insidious Westinghouse mark which has unfairly placed appellant's motor in a false and degrading light before the purchasing public.

The predominant part of the respective marks, the suffix "Line," is not primarily descriptive of an electric motor, and Westinghouse by its own representation to that effect before the examiner is here estopped from claiming that it is. Skol Company, Inc. v. Olson, 151 F.2d 200, 33 C.C.P.A., Patents, 715. Since words primarily descriptive of the goods or their character are the only words which reside in the public domain subject to be freely appropriated by any person in the same line of business for use in the sale of wares, Standard Paint Co. v. Trinidad Asph. Co., 220 U.S. 446, 453, 31 S.Ct. 456, 55 L.Ed. 536; Celanese Corp. of America v. E. I. Dupont De Nemours & Co., 154 F.2d 146, 33 C.C.P.A., Patents, 948; KoolVent Metal Awning Corp. of America v. Price, 368 Pa. 528, 84 A.2d 296, Westinghouse is not entitled to appropriate "Line" as part of the mark which that corporation here desires to register. In re Brockway Glass Company, Inc., 154 F.2d 673, 33 C.C.P.A., Patents, 969.

There is no escape from the conclusion upon the facts presented that West-

---

3. Westinghouse took no testimony but its counsel was present and cross-examined witnesses who testified for appellant.

inghouse in this case has attempted through the color of law to obtain an unfair advantage over its competitor, and therefore registration of its mark should be refused not only on the ground of confusing similarity but also on the ground of unfair competition. Coty, Inc. v. Perfumes Habana, S. A., 190 F.2d 91, 38 C.C. P.A., Patents, 1180; Kaut-Reith Shoe Co. v. International Shoe Co., 45 App.D.C. 545. This is particularly true under the Act of 1946, which provides that the greatest protection at home and abroad must be given to previously registered trade-marks used on competitive goods. Bacardi Corp. v. Domenech, 311 U.S. 150, 61 S.Ct. 219, 85 L.Ed. 98; S. C. Johnson & Son v. Johnson, 2 cir., 175 F.2d 176, certiorari denied 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527.[4]

The following statement quoted from the decision of Coty, Inc., supra [190 F.2d 95], is of special significance here:

"The Commissioner of Patents, in placing the imprimatur of the Patent Office of the United States Government upon applicant's marks by granting registration thereof, pursued a method of reasoning whereby the trivial was exploited and the important ignored. As Mr. Justice Holmes put it, writing for a unanimous Court in Coca-Cola Co. v. Koke Co., 254 U.S. 143, 41 S.Ct. 113, 65 L.Ed. 189: 'Of course a man is not to be protected in the use of a device the very purpose and effect of which is to swindle the public.' Justice Holmes further pointed out there that the defects of an owner's trade-mark 'do not offer a very broad ground for allowing another to swindle him.' "

Appellant has raised other points regarding the secondary meaning of its trademark and presented other facts tending to prove that Westinghouse in the adoption of the word "Line" had illegally appropriated advertising material which appellant had used in the association with the sale of its merchandise long before Westinghouse entered the field.[5]

It is difficult, however, to completely define here the validity of appellant's position in those respects. Findings of fact derived from what might be called conference table consideration are not as a rule clear cut and complete like the findings of fact based upon additional extrinsic evidence produced in open court by recourse to testimony from the market place and the consuming public. Philadelphia Inquirer Co. v. Coe, 77 U.S.App.D.C. 39, 133 F.2d 385. Therefore, appellant should exercise its right under the statute and present the issue *de novo* before such a tribunal. John Morrell & Co. v. Doyle, 7 Cir., 97 F.2d 232.

For the reasons hereinbefore stated, the decision of the Examiner-in-Chief, in my opinion, should be reversed.

---

4. See also sections 44(h) and (i) of the Trade-Mark Act of 1946, 15 U.S.C.A. § 1126(h, i); Robert, The New Trade-Mark Manual, pages 167–180; Jewel Tea Co. v. Kraus, 7 Cir., 187 F.2d 278.

5. Section 45 of the Act of 1946, 15 U.S. C.A. § 1127; Cheek-Neal Coffee v. Hal Dick Mfg. Co. [Good to the Last Drop], 40 F.2d 106, 17 C.C.P.A.,Patents, 1103, 1104; Lucky Heart Laboratories, Inc. v. Morton G. Neumann, 154 F.2d 519, 520, 33 C.C.P.A.,Patents, 1034.