42 C.C.P.A.(Patents)

**MISHAWAKA RUBBER AND WOOLEN MFG. CO.**

v.

**BATA NARODNI PODNIK (Now by change of name, Svit Narodni Podnik).**

**Patent Appeal No. 6088.**

United States Court of Customs and Patent Appeals.

April 28, 1955.

Johnson, Judge, dissented.

Miles D. Pillars, Washington, D. C. (Eugene M. Giles, Chicago, Ill., of counsel), for appellant.

Pierce, Scheffler & Parker, Washington, D. C. (Ralph E. Parker, Washington, D. C., of counsel), for appellee.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY and COLE, Judges.

O'CONNELL, Judge.

This is an appeal from the decision of the Examiner-in-Chief of the United States Patent Office, acting by delegation of authority for the Commissioner of Patents and affirming the decision of the Examiner of Trade-Mark Interferences, 98 U.S.P.Q. 284, dismissing appellant's opposition to the registration by appellee of a composite mark comprised of the letter "B" superimposed upon a circular ball-like background, colored red, and used on "Pneumatic tires, inner tubes and tire insertion pieces."

The record is silent as to the applicant's use of its mark in the commerce of the United States, and the application, filed under section 44(d) of the Act of 1946, 15 U.S.C.A. § 1126(d), is based on the foreign registration, No. 10,528 of record, which was applied for and granted on the same day, April 2, 1948, in Czechoslovakia, for use there on the goods thus listed in said registration:

"1) *Bata, narodni podnik, (National Enterprise) Zlin.*

"2) *Manufacture of Leather, footwear and leather goods of all kinds and exploitations of the industrial and other rights of the nationalized enterprises incorporated in the 'Bata, narodni podnik', Zlin.*

"3) *Pneumatic tires, inner tubes and tire insertion pieces.*" (Italics supplied.)

Thereafter appellee filed an application for registration of said Czechoslovakian mark in the United States Patent Office, July 9, 1948, only for use, however, with a part of the goods of appellee hereinbefore described; namely, pneumatic tires, inner tubes, and tire insertion pieces, known as rim liners.

Appellant, Mishawaka Rubber and Woolen Manufacturing Company of Indiana, herein referred to as Mishawaka, has been successfully engaged since 1886 in the production and sale of "soft" rubber products and predicated its opposition upon its prior use and ownership of two trade-marks or group of registrations, such as (1) its principal mark, a circular ball-like disc, colored red, registered respectively on May 28, 1901, No. 36,471; April 20, 1915, No. 103,909; May 24, 1927, No. 228,151; April 12, 1938, No. 356,086; and (2) the equally well-known notation "Ball Band," printed in large and bold black face letters, or capitals, registered January 19, 1897, No. 29,476; April 2, 1901, No. 36,151; and November 23, 1948, No. 504,111.

The term "Ball Band" was derived from the rubber or leather band at the top of boots sold by Mishawaka and the red ball imprinted on the lug or straps thereof for pulling on the boots. The application for registration filed in 1892 states:

"Said trade-mark consists of the arbitrarily-selected word-symbol or compound word 'Ball-Band.'

"In the facsimile filed herewith there is shown a wool boot having a dark band at the top thereof, as well as having dark straps, the strap on the side of the boot represented having thereon in white letters the trade-mark word 'Ball-Band,' as well as a representation of a ball or circular figure. Said circular figure, as used by said company, as an additional distinguishing mark or brand, is generally, for the purpose of giving the same greater prominence, woven by using warp of red color into both straps.

It is asserted, and shown in appellant's exhibits of record, that Mishawaka for years has used in the extensive advertising of its goods the slogan "Look for the Red Ball."

Appellant Mishawaka has sold through 44,000 dealers in the United States, advertised as "Ball Band" dealers, and otherwise through catalogues and regular sales channels throughout the world, *including Czechoslovakia*, more than a half billion dollars worth of its merchandise; $500,000,000 in footwear and $5,000,000 in rubber floor mats and cushions for automobiles. Such articles were sold throughout the world under both of Mishawaka's trade-marks hereinbefore described and specifically include or have included:

" * * * footwear made of rubber and of combinations of rubber and fabric and of rubber and leather, —namely boots, shoes, overshoes, arctics, gaiters, rubbers, footholds, locker sandals, overs, canvas shoes, casual and novelty shoes, also rubber soles and heels, wool boots, knit gaiters, knit wool bootees, insoles, and wool socks.

\* \* \* \* \* \*

" * * * galoshes and rubbers, socks, stockings, garters, and separable fasteners of the slider-controlled type, *and has used said trademark on rubber tires* and other products made wholly or partly of rubber, said trade-mark having been and being prominently displayed upon the opposer's goods in a generally circular form, and upon the packages containing same, and in the advertisements thereof, and at the stores in which the opposer's goods were and are handled, displayed, and

sold, and the opposer contemplates continuing to use it said trade-mark in like manner on such goods and on other goods and articles." (Italics ours.)

The articles described in appellee's foreign registration denote that it is engaged in the same line of business as that of appellant, Mishawaka, although specific articles produced by the latter may differ at times from those of appellee. The extent of appellee's use of the mark in Czechoslovakia or elsewhere has not been established and appellant observes in its brief that appellee "seeks registration solely on the basis of registration in its place of domicile,—Czechoslovakia, —presumably with the intention of distributing its goods here." [1]

"Commercial magnetism" [2] was engendered in an extensive measure in the world-wide sale of the goods of Mishawaka due not only to the fine quality of the products marketed by Mishawaka but also to the effective results of $5,000,000 judiciously spent by Mishawaka in advertising its goods.

Neither party took testimony. In lieu thereof, appellant, Mishawaka, filed stipulated facts agreed to by appellee. Both of the parties filed briefs and were represented at the hearings in the Patent Office.

There can be no dispute that the circular red disc or red ball background appropriated for use in its trade-mark by appellee is no different from the red ball or circular background previously used in its trade-mark by Mishawaka for generations. Nor is there any further dispute that the capital "B" in the newcomer's mark is the first initial or capital letter in each of the two words "Ball Band" which appellant has likewise used in combination with the red ball on its wares or separately in advertising display down through the years.

The court is asked here to take judicial notice of the familiar and readily accessible fact that established manufacturers of rubber goods, such as Goodyear Tire & Rubber Company, B. F. Goodrich Company, and Firestone Tire and Rubber Company, manufacture and sell not only automobile tires and tubes but also rubber heels, rubber boots, galoshes, overshoes, sponge rubber padding (mattresses, upholstery), and the like. These goods as a class, it is asserted, are considered by the purchasing public as "closely related items" or "goods of the same general kind to which a mark would bear a natural trade significance" since they fall within the field of goods manufactured and sold by kindred rubber companies.

1. Industrial organizations operating on a modern basis are known to have manufacturing plants and offices both here and abroad. However, this court in determining the validity of a trade-mark does not indulge in presumptions with respect to the applicant's intentions. Appellee may have resort to the procedure sanctioned by International Agreements with respect to foreign registrations and rely upon the measure of protection afforded them in this country in accordance with conventions entered into by the United States. Masters, Wardens, Searchers, etc. v. Cribben and Sexton Co., 202 F.2d 779, 40 C.C.P.A.,Patents, 872. See also article 517, Customs Regulations, and sec. 526 of the Tariff Act of 1930, 19 U.S.C.A. § 1526.

2. Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381, "The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trademark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, * * * desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress." [Italics ours.]

A favorable decision was rendered in favor of Bata by the Examiner of Trade-Mark Interferences who, having formally acknowledged in his decision that, based upon its foreign registration, "it appears that the applicant also manufactures footwear," and furthermore that "it is common knowledge that some rubber manufacturers make a large variety of products, many of which are so totally different from one another as to have nothing in common," nevertheless held:

> "The wide differences in the goods of the parties alone are deemed sufficient to obviate any reasonable likelihood of confusion, or deception of purchasers; however, it is not necessary to rely on the differences in the goods alone for obviating a likelihood of confusion since the marks also contain differences which are quite substantial, as the projecting tail-like elements, and the initial letter 'B' contained in applicant's mark is not present in opposer's mark. These differences in the marks together with the wide differences in the goods are cumulative in their effect, and are clearly deemed to be such as to enable their contemporaneous use for the goods involved, without any reasonable likelihood of confusion, or mistake, or deception of purchasers."

The Examiner-in-Chief reviewed the decision of the examiner with approval and concluded:

> "In the instant case applicant's mark is clearly dominated by the fanciful form of the letter 'B' which includes the comet or tail-like projections from the stem and to the left of the 'B' and outside of the red circle. This renders the mark as a whole quite unlike opposer's mark and clearly distinguishable therefrom. I also agree with the examiner that the goods of the parties are not the same and that the differences in the marks and in the goods are cumulative to such an extent as to obviate any reasonable likelihood

of confusion as to the origin of the goods."

Mishawaka wholly disagrees with that conclusion. It argues with emphasis that no purchaser of the goods could envision those small lines on a mark applied to an automobile tire, and that no person, meteorologist, or otherwise, would be able to see or associate the described little projections as having a comet tail effect, with or without the aid of a microscope, citing Guggenheim v. Cantrell & Cochrane, 56 App.D.C. 100, 10 F.2d 895. The applicant's mark applied to a tire is apparently about three-fourths of an inch in diameter. The letter "B" which is superimposed thereon has a dimension of even less than that, and the three little projections could scarcely acquire a distinguishing feature which transforms the ordinary letter "B" into something else of fanciful design.

The original Examiner of Interferences in the first Patent Office action involved in these proceedings had refused registration of appellee's mark on the ground that the applicant's letter "B," as it is printed here in script with some small projections, was in conflict with prior marks of record also consisting of the letter "B," printed in block type. In overcoming that rejection before a subsequent Examiner of Interferences, the applicant successfully argued thus:

> " * * * Comparing the marks themselves it is believed apparent that the red circular background with the script 'B' and comet tail effect presents an entirely different impression from that conveyed by the block 'B' in a square border outline of the reference mark, so that here again if the marks were seen by the average customer on the respective goods displayed side by side there would be no possibility of confusion due to the essentially different impression conveyed by them."

That suggestion appears to have persisted as the basis of the concurring decisions of the Patent Office. Side by side comparisons of composite marks may

be resorted to by the experts of the Patent Office in evaluating the dominant parts of the respective marks of competing vendors so as to determine the significance with which such analyzed parts endow the mark when combined and considered as a whole, as they are so considered by the purchasing public. Miles Laboratories, Inc., v. Foley & Co., 144 F.2d 888, 32 C.C.P.A., Patents, 714.

When it comes to trade-marks, the views of the experts in the Patent Office or elsewhere do not necessarily establish, however, that the purchasing public would recognize, analyze, and be guided by the same understanding and consideration of the marks. In re Duvernoy & Sons, Inc., 212 F.2d 202, 41 C.C.P.A., Patents, 856. The following excerpt from Schering & Glatz, Inc., v. Sharp & Dohme, Inc., 146 F.2d 1019, 1021, 32 C.C.P.A., Patents, 827, 831, is deemed worthy of repetition:

"This raises the point as to who constitutes the public in the instant case.

"The statute provides protection for people who have occasion to engage in the purchase of goods. The trade-mark law is made not only for the protection of experts, but also for the public in general—the vast multitude which includes the ignorant, the unthinking, and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions. See Florence Mfg. Co. v. Dowd, 2 Cir., 178 F. 73, 75."

People who constitute the purchasing public seldom have an opportunity to make a side-by-side comparison of the marks of competing vendors. Buyers could hardly be expected to know in the instant case of the existence of the newcomer's mark or of its goods. A universal pattern by which this and other courts have been guided in the past in trade-mark cases was thus stated by Chief Justice Smyth in Coca-Cola Co. v. Chero-Cola Co., 1921, 51 App.D.C. 27, 273 F. 755, 756:

"* * * To require that the line which separates marks should be well defined is not to ask too much, since the field from which a person may select a mark is almost limitless. * * *

"Of course, if the two marks were placed together, or if a person's attention was in some other way directed to them, there would be no difficulty in apprehending the difference between them. This, however, is not the way to make the test. Ordinarily the prospective purchaser does not carry more than a faint impression of the mark he is looking for. If the article offered to him bears a mark having any resemblance to the one he is thinking of, he is likely to accept it. He acts quickly. He is governed by a general glance. The law does not require more of him. * * *"

The three projections or furbelows employed with applicant's "B," printed in script, follow a common practice in the printing art with respect to letters of the alphabet, and nowise obscure, diminish, or detract from the natural and essential character of the letter "B" merely to signify the presence in the firm of the original Bata, for whom Svit has now been substituted. Those little lines, otherwise of no special significance, have been developed in the final decision of the Patent Office in fanciful design as "comet or tail-like projections" which overshadows and supplants the real attributes of "B" as a letter of the alphabet. Letters of the alphabet in everyday usage, as Mishawaka correctly points out, are commonly capitalized and embellished with ornate lines and flourishes for use as monograms, signet rings, and so-called illuminated type employed in newspapers, magazines, and advertising literature. Nobody is thereby impressed with them as something consisting of the unusual or fantastic.

These letters are superimposed, like appellee's "B," on a background of color to such an extent that neither the "B"

nor the red background upon which it is printed, standing alone, would be attractively distinctive or significant in the field of trade-marks without the benefit of vast sums of money spent for advertising in their exploitation. Mishawaka R. & W. Mfg. Co. v. Panther-Panco Rub. Co., Inc., 1 Cir., 153 F.2d 662. Mishawaka has spent $5,000,000 for that purpose. The result of that expenditure may account for appellee's persistence in claiming the "B" in its trade-mark for Bata, when Bata has long since departed, and Svit has taken its place in appellee's organization. The red ball and the two "B's" in "Ball Band" have attained world renown and have been made valuable and magnetic in the markets for soft rubber goods by extensive advertising and use.

The use of such a "B" might well be the opening wedge appellee has hit upon to suggest to the unwary and the gullible a connection with Mishawaka's world-wide distribution of its goods. Such methods are prohibited not only by the explicit terms of section 2 of the Act of 1946 but Mishawaka's marks here in issue under somewhat similar circumstances were vigorously protected by the Supreme Court under the Act of 1905. Mishawaka Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381. The same laws likewise apply to Mishawaka's trade-marks under the Act of 1946, 15 U.S.C.A. § 1051 et seq. Steele v. Bulova Watch Co., 344 U.S. 280, 287, 73 S.Ct. 252, 97 L.Ed. 252.

Appellee's reliance upon the alleged fact that it has a common right to appropriate not only the dominant features of appellant's marks, the red ball, but also to use the letter "B" superimposed thereon, because each of such marks is a "weak" mark is without merit. Mr. Justice Holmes long ago suggested in the rejection of such arguments that the weakness of a mark used by a previous owner is not a valid ground upon which to appropriate it and injure him as well as deceive the purchasing public as to the origin of the goods. Coca-Cola Co. v. Koke Co., 254 U.S. 143, 41 S.Ct. 113, 65 L.Ed. 189. A strong and fanciful mark is entitled to broad protection. Sunbeam Furniture Corp. v. Sunbeam Corp., 9 Cir., 191 F.2d 141; Yale Electric Corp. v. Robertson, D.C., 26 F.2d 972. But appellee does not qualify in that respect.

There is no basis from the evidence produced in the record of this case for the concurring conclusions of the tribunals of the Patent Office that there is anything distinguishing or legally distinctive in the respective line of goods in which the parties to this litigation are engaged, a distinction which would alert an ordinary, unwary purchaser to the fact that the goods which he carries home are not the goods of Mishawaka.

The last of the two Examiners of Interferences, hereinbefore described, in his decision stated, as hereinbefore noted, that it appears, in addition to automobile tires and tubes, "the applicant also manufactures footwear," the principal item of merchandise which Mishawaka admittedly has marketed on a world-wide basis for many years prior to the newcomer's entry into the field.

That holding of the examiner was not reversed by the Examiner-in-Chief, and under the established rule of the Patent Office so frequently invoked by its officials against the applicant in other cases, the holding is to be regarded here as one which has been affirmed by the Acting Commissioner. The Solicitor for the Patent Office in a similar situation respecting a statement by the Primary Examiner in another case here submitted for decision, correctly pointed out that such a "statement must be accepted as accurate, since the applicant has offered no evidence to controvert or refute it," citing In re Thayer, 143 F.2d 996, 31 C.C. P.A., Patents, 1224, and numerous other cases.

In any event, an industrial organization, such as appellee Svit, engaged in the production of articles from soft rubber, as distinguished from hard rubber products, may, in the natural expansion

of its business, engage not only in the manufacture of rubber tires but also the manufacture of footwear, etc., without the necessity of applying for and procuring a separate registration covering each particular and additional item. Celanese Corp. of America v. E. I. DuPont De Nemours & Co., 154 F.2d 146, 33 C.C.P.A., Patents, 948. On this point appellant Mishawaka aptly states in its brief:

> "Moreover, the respective goods are not dissociated with one another in the respect that they are merely incidental or specialties in the lives of purchasers, and of little intimacy or concern to them.

> "Almost everyone generally uses rubbers, rubber overshoes or galoshes or rubber boots and likewise most everyone uses tires, either on their automobile, bicycle or tractor. The purchasers thereof are of substantially the same class. The goods of Opposer and of Applicant are of the same rubber type, and are similar in nature, utility and in their respective uses. They are not remotely related but are quite similar in class.

> "This appears to have been the view of the Examiner-in-Chief who merely regarded them as 'not the same' * * * and it is submitted that the differences in the goods are not such as to inspire any question or uncertainty on the part of ordinary purchasers as to whether or not they may have come from one source."

■ It was observed in the decision of the final examiner that because Mishawaka did not renew its registration of its two involved trade-marks for use on rubber tires and tubes it thereby abandoned its marks forever for such use, despite the fact that Mishawaka continued to use them as always on a wide variety of other articles made from soft rubber which Mishawaka sold in large volume throughout the world. The rule thus applied in the Patent Office to the facts of the case at bar is not and never was the law.

Appellee may not by its appropriation of appellant's marks previously used for a presently discontinued article of merchandise thereby forestall the natural expansion of appellant's business so as to include again the article in question. See Bulova Watch Co. v. Steele, 5 Cir., 194 F.2d 567, affirmed 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319. See also Continental Distilling Corp. v. Old Charter Distillery Co., 88 U.S.App.D.C. 73, 188 F.2d 614. Mr. Justice Holmes writing in a case wherein the composite unabandoned mark "Beech Nut" had not been used by its owner for a period of years had occasion there to correct the decisions of the lower federal courts and to hold no abandonment of the involved mark had been thus effected and denied its appropriation by a newcomer who sought to exploit the original owner's rights:

> "Therefore the fact that the good will once associated with it has vanished does not end at once the preferential right of the proprietor to try it again upon goods of the same class with improvements that renew the proprietor's hopes. Beech-Nut Packing Co. v. P. Lorillard Co., 1927, 273 U.S. 629, 632, 47 S.Ct. 481, 482, 71 L.Ed. 810.

There is no escape from the conclusion, based upon the unqualified facts of record, that the contesting parties in the instant litigation are engaged in the same line of business, that while the articles respectively produced by them may differ from time to time, nevertheless all of such articles are of the class usually produced by the manufactures of soft rubber and ordinarily originate in the same industry. The differences in such articles nowise require the registration of a separate mark or marks to identify all of such respective articles. This court recently approved the following language quoted as an excerpt in the case of Alligator Co. v. Larus & Bro. Co., Inc., 1952, 196 F.2d 532, 535, 39 C.C.

P.A., Patents, 939, 944, regarding the legal effect of the pertinent statutory language in the Act of 1946:

"'* * * It is no longer necessary to establish that the goods of the parties possess the same descriptive properties, as was previously required under Section 5 of the Trade-Mark Act of 1905, and it has been held by the Patent Office in ex parte matters that the new section provides a more flexible test which will require refusal of registrations in cases where there is likelihood of confusion, mistake or deception, even though the goods fall into different categories * * *.'"

■■ In other words, articles of merchandise which are entirely different from one another, may originate from the very same source and bear the identical trade-mark which will be protected in such use under the law. The latest statement to that effect by the Acting Commissioner of Patents has been officially and correctly reported in Behr-Manning Corp. v. Super-Cut, Inc., 101 U.S.P.Q. 418:

"In determining whether there is likelihood of confusion, one is not concerned merely with confusion in goods; the question is whether goods are of a nature which purchasers might reasonably assume to come from same source."

We cannot blind ourselves to the unqualified fact that almost all branches of modern industry manufacture a widely diversified list of articles which are distributed to the purchasing public at home and abroad under one or more trade-marks applied singly or collectively to the goods as in the case at bar. The authorities hereinbefore cited exemplify a long line of cases which have acknowledged that fact and have refused to eliminate the likelihood of confusion where the marks of competing vendors closely resemble one another in sound, meaning, and appearance, respectively, or in combination. That principle is one of the oldest in trade-mark law, and in accordance therewith we recently rejected the trade-mark of the newcomer, attached to substantially identical goods, on the ground that the mark was confusingly similar in meaning to that of the prior and competing owner in the field, although the newcomer's mark otherwise differed completely in sound and appearance. Hancock v. American Steel & Wire Co. of N. J., etc., 203 F.2d 737, 40 C.C.P.A., Patents, 931.

There is authority for the proposition that a single letter of the alphabet may constitute a valid trade-mark and the owner's monopoly therein protected in courts of law and equity. McLean v. Fleming, 96 U.S. 245, 254, 24 L.Ed. 828; Crystal Corp. etc. v. Manhattan Chemical Mfg. Co., Inc., etc., 75 F.2d 506, 22 C.C.P.A., Patents, 1027; Rosenblum v. Rosenblum, D.C., 253 F. 863, 864; Autoline Oil Co. v. Indian Refining Co., Inc., D.C., 3 F.2d 457, 462. In considering the realities of the case, we are at a loss to know what a customer would say in calling for the appellee's goods. He could no longer call for a "Bata" tire, because Bata is no longer with the firm. If the customer asked for a "B" tire, he might well receive a recap, or one of inferior grade, since "B" has been understood in the trade to denote an article of inferior quality. Brown-Brockmeyer Co. v. Westinghouse Elect. Corp., 197 F.2d 871, 39 C.C.P.A., Patents, 1050, 1055.

In all probability, such a customer, if he knows of appellee's mark and merchandise, will call for a tire described by him, according to its trade-mark, as the "B" brand, with the "B" mounted on a red circular disc, or red ball; the same as the predominant red ball which Mishawaka has registered and developed on a world-wide basis by great expenditure of money for advertising.

Prior to Congressional enactment of the Trade-Mark Act of 1946, the House and Senate Committees on Patents rec-

288

ommended passage of the proposed legislation and the Senate Committee report [3] contained the following statement with respect to the basic purposes of the bill:

"The purpose underlying any trade-mark statute is twofold. One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats. This is the well-established

rule of law protecting both the public and the trade-mark owner. * * "

The Supreme Court noted in Mishawaka Mfg. Co. v. S. S. Kresge Co., supra, that shoppers and buyers have a right to rely on standard brands and to do so free from hazards or designs laid by newcomers to trap the unwary. That rule should apply here.

For the reasons hereinbefore stated, the decision of the Commissioner of Patents is reversed.

Reversed.

WORLEY, Judge, concurs in the conclusion.

JOHNSON, Judge, dissents.

3. Senate Committee Report on Lanham Trade-Mark Bill, Senate Report No. 1333, 79th Congress, 2d Section, Submitted May 14, 1946, incorporating report of The House Committee on Patents. See also Robert, The New Trade-Mark Manual, page 266.