LIMERICK AUTO BODY, INC, d/b/a
Limerick Auto Body, Appellees,

v.

LIMERICK COLLISION CENTER,
INC., Appellant.

Superior Court of Pennsylvania.

Argued Nov. 16, 2000.

Filed Feb. 22, 2001.

Reargument Denied April 25, 2001.

---

**3.** I do note that I would not foreclose the possibility of implementing a rebuttable presumption that stock options that are "granted" or "awarded" have been earned, based on the proposition that the party who has been granted or awarded an option is in the best position to develop its precise characteristics on the record. Before acceding to this or any other position, however, I would want to consider the range of available options as developed in an appropriate case.

Gregory J. Dean, King of Prussia, for appellant.

Kenneth E. Picardi, Pottstown, for appellee.

Before FORD ELLIOTT, J., EAKIN, J., and CERCONE, President Judge Emeritus.

CERCONE, President Judge Emeritus:

¶ 1 This is an appeal from a preliminary injunction issued by the Trial Court enjoining Appellant from conducting business under the name Limerick Collision Center or Limerick Collision Center, Inc. After review, we vacate.

¶ 2 This matter arises out of a dispute between competing auto body repair shops doing business in Limerick, Pennsylvania regarding the purported similarity in the names of their businesses. On May 12, 2000, Appellee Limerick Auto Body ("Limerick Auto") filed a petition for a preliminary injunction seeking to enjoin Appellant Limerick Collision Center ("Limerick Collision") from conducting business under the name Limerick Collision Center. A hearing was conducted on June 8, 2000, following which Limerick Auto's request

for a preliminary injunction was granted. Judge William T. Nicholas, sitting as chancellor, made the following findings and conclusions:

1. [Limerick Auto] and [Limerick Collision] are both engaged in the business of automobile collision repair in Limerick Township, Montgomery County (N.T., June 8, 2000, pp. 178–179).

2. [Limerick Auto] has been doing business as its present location, under the name "Limerick Auto Body," since 1991 or earlier (N.T., June 7[sic], 2000, p. 177).

3. [Limerick Collision] has been doing business as its present location, under the name "Limerick Collision Center," only since October or November, 1999, prior to which time [Limerick Collision] operated its business in King of Prussia, under the name "Ken's Collision Center" (N.T., June 8, 2000, pp. 177–178).

4. Within the context of the automobile repair business, the terms "auto body" and "collision" are synonymous (N.T. June 8, 2000, p. 179).

5. [Limerick Auto] has engaged in extensive advertising with the goal of achieving name recognition for its business among the public (N.T., June 8, 2000, pp. 178–179).

6. The geographical name "Limerick" has acquired a secondary meaning within the context of auto body/collision repair in Limerick township in that both the automobile collision repair industry and the public at large have come to associate the name "Limerick" with [Limerick Auto]'s business (N.T., June 8, 2000, pp. 178–179).

7. The names "Limerick Auto Body" and "Limerick Collision Center" are deceptively similar, and [Limerick Collision]'s use of the name "Limerick Collision Center" has led both the industry and public at large to confuse the identi-

ties of the two businesses (N.T., June 8, 2000, pp. 179–180).

8. [Limerick Auto] has developed an excellent reputation for the quality of its collision repair work, and this reputation constitutes a valuable asset (N.T., June 8, 2000, p. 177).

9. [Limerick Auto] is entitled to enjoyment of its trade name free from infringement by businesses with deceptively similar names, and [Limerick Auto] is thus likely to succeed on the merits of its action (N.T., June 8, 2000, pp. 179–183).

10. Greater harm would result from denying [Limerick Auto]'s petition for preliminary injunction than from granting it (N.T., June 8, 2000, pp. 181–182).

11. [Limerick Auto] has no adequate remedy at law (N.T., June 8, 2000, p. 182).

Trial Court Opinion, 7/19/00, at 1–2.

¶ 3 The Trial Court's Order provides as follows:

And now, this 8th day of June, 2000, upon consideration of Plaintiff's Petition, it has been determined that (1) Plaintiff will suffer irreparable harm and loss if, pending disposition of Plaintiff's Complaint, Defendant is permitted to continue in the automobile collision repair and body work business under the name Limerick Collision Center; and (2) Plaintiff does not have an adequate remedy at law; and (3) greater injury will be inflicted upon the Plaintiff by denial of the Preliminary Injunctive Relief than would be inflicted upon the Defendant by granting such relief; and (4) that Defendant's use of a name substantially similar to that of Plaintiff allows Defendant to compete unfairly with Plaintiff; and (5) it appears likely that Plaintiff will be successful on the merits of its claim; thus,

It is hereby Ordered and Decreed that;

(1) After ninety (90) days from the date of this Order, Defendant is hereby enjoined from operating an automobile collision repair and body shop under the name Limerick Collision Center, or Limerick Collision Center, Inc.

(2) Defendant is enjoined from carrying on or doing business under the corporate name Limerick Collision Center, Inc. or Limerick Collision Center forthwith and from causing or permitting its name to be listed in any telephone books, or other directories or trade lists and from advertising its name in connection with its business in any manner whatsoever; and

(3) This Order shall remain in force and effect until such time as the Court specifically orders otherwise; conditioned upon bond posted by plaintiff. Bond is set in the sum of $300.00.

Trial Court Order, 6/8/00.

¶ 4 Limerick Collision requested a stay of the injunction pending appeal. The request was denied by the Trial Court. The stay was subsequently granted by this Court (*Limerick Auto Body, Inc. v. Limerick Collision Center, Inc.*, 1569 EDA 2000, 6/16/00), but dissolved by our Supreme Court the same day (*Limerick Auto Body, Inc. v. Limerick Collision Center, Inc.*, 0107 Miscellaneous 2000, 6/16/00). On June 19, 2000 the Pennsylvania Supreme Court denied reconsideration of the stay of the injunction. Limerick Collision's notice of appeal of the order of June 8, 2000 granting the preliminary injunction was filed on June 20, 2000. A statement of matters complained of on appeal was filed on June 29, 2000.

¶ 5 Limerick Collision presents four (4) questions for our review:

1. Whether the words "Limerick Auto Body" and "Limerick Collision Center"

are so confusingly similar so as to create unnecessary confusion for customers or purchasers, justifying the issuance of a preliminary injunction.

2. Whether the lower court erred in concluding that the word "Limerick" had acquired a secondary meaning, sufficient to justify exclusive rights in the Plaintiff to its use.

3. Whether a preliminary injunction should have been granted in the absence of evidence showing the existence of damage, past, present or future.

4. Whether a preliminary injunction should be granted when its effect is to create more harm to the Defendant than would be created by a refusal to grant such relief for Plaintiff.

Appellant's Brief at 4.

¶ 6 As we have held:

[W]e are guided by a rather limited standard of review of a trial court's grant of a temporary preliminary injunction. We will reverse only where we can confidently conclude that the trial court was palpably erroneous, misapplied the law or committed a manifest abuse of discretion. If there are any apparently reasonable grounds for the trial court's decision, we must affirm it. We also emphasize ... that a preliminary injunction is an extraordinary remedy to be utilized only where the plaintiff has established a clear right to relief.

*Insulation Corp. of America v. Brobston*, 446 Pa.Super. 520, 667 A.2d 729, 733 (1995) (citation omitted).

¶ 7 Our Supreme Court has set forth the prerequisites for the issuance of a preliminary injunction as follows:

First, that it is necessary to prevent immediate and irreparable harm which could not be compensated by damages; second, that greater injury would result by refusing it than by granting it; and third, that it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct. Even more essential, however, is the determination that the activity sought to be restrained is actionable, and that the injunction issued is reasonably suited to abate such activity.

*Valley Forge Historical Society v. Washington Memorial Chapel*, 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981).

¶ 8 In order to be entitled to injunctive relief in an action for unfair competition[1] the plaintiff must prove that he has a legal right to exclusive use of his trade name, that the defendant is using a trade name that is confusingly similar, and that defendant's use of the name is likely to cause confusion in the plaintiff's competitive area. *Zimmerman v. Holiday Inns of America*, 438 Pa. 528, 534–535, 266 A.2d 87, 90 (1970). Generally, geographical words, such as "Limerick", are incapable of becoming a valid trade-mark, because they "belong to the public and are not capable of exclusive appropriation by anyone.[2] This general principle is subject to

1. As our Supreme Court has held: "That the court below did not specifically base its decree upon trade-mark infringement or upon unfair competition, is of no consequence. The common law of trademarks is but a part of the broader law of unfair competition." *Thomson–Porcelite Co. v. Harad*, 356 Pa. 121, 124, 51 A.2d 605, 606 (1947).

2. We note that it is undisputed that the terms "auto body" and "collision" as used in the auto body repair industry are synonymous. At the hearing, Limerick Auto presented an expert witness in the field of auto body repair who testified that the terms were synonymous. N.T., 6/8/00, at 19, 25. Although presented with the opportunity to cross examine the witness or call its own witness in rebuttal, Limerick Collision did not dispute the expert's testimony that the terms are synonymous. We agree that the terms are synonymous and agree with the parties' contention that the

the limitation or exception that if a trade-name ... [has] acquired, in the trade and in the minds of the purchasing public, a special or so-called secondary meaning, i.e. have come to mean that the article is the product of a certain manufacturer or of a particular individual ... such trade-name ... will be protected against infringement." *Koolvent Metal Awning Corp. v. Price*, 368 Pa. 528, 532, 84 A.2d 296, 298 (1951); *See also Quaker State Oil Refining Co. v. Steinberg*, 325 Pa. 273, 189 A. 473 (1937). "Even though a word or phrase or mark has acquired a special or secondary meaning, the right of protection ... will be afforded only against names or marks which are deceptively similar thereto and consequently are likely to confuse the public." *Koolvent* at 533, 84 A.2d at 298; *See also Quaker State, supra.* "It is not necessary that the public should be actually deceived in order to afford a right of action.[3] All that is required is that the infringement should have a tendency to deceive ... [i]t is sufficient that [defendant's] use of the word in the manner complained of is reasonably likely to produce confusion in the public mind." *Thomson–Porcelite Co. v. Harad*, 356 Pa. 121, 125–126, 51 A.2d 605, 607 (1947). "The possibility that purchasers will be misled is not enough." *Peters v. Machikas*, 378 Pa. 52, 59, 105 A.2d 708, 712 (1954).

¶ 9 In its second issue, Limerick Collision contends that Limerick Auto failed to satisfy the first element of an action for unfair competition as enunciated in *Zimmerman*. We agree.[4] Because

"Limerick" is a geographic term, in this case the name of a community in Pennsylvania, in order to maintain an action for unfair competition Limerick Auto must prove that the term has acquired a secondary meaning, in other words, that people in the automotive business or members of the public associate "Limerick", when used in the context of auto body repair, with Limerick Auto Body.[5] "No clear test has emerged in Pennsylvania as a satisfactory method of establishing the existence of a secondary meaning." *Quality Weaving Co. v. Regan*, 245 Pa.Super. 66, 369 A.2d 296, 299 (1976). In the past, several factors have been considered in determining the existence of a secondary meaning. Most often, advertising and witness testimony have been the determining factors. It has been held, however, that advertising by itself, no matter how extensive, is insufficient to establish a secondary meaning. *See Quaker State, supra; Quality Weaving, supra; Koolvent Metal Awning, supra; Miscellaneous, Inc. v. Klein's Fashions, Inc.*, 452 Pa. 62, 305 A.2d 22 (1973). Also, witness testimony must be representative of the purchasing public in the plaintiff's competitive area and must establish that the purchasing public views a term as representing the plaintiff's business. *See Quality Weaving, supra; Zimmerman, supra; Miscellaneous, supra.* When businesses use similar names, it is inevitable that confusion will result, however, incidental customer confusion does not establish that one business's use of a name has given it a secondary meaning. *See Quality Weaving, supra; Miscellaneous, supra.*

---

problem hinges on Limerick Collision's use of the term "Limerick".

**3.** "Actual deception of the public is only material to the question of damages." *Thomson Porcelite* at 125, 51 A.2d at 607.

**4.** Because of our disposition of this issue, it is unnecessary to address the remaining three issues.

**5.** The burden of proving a secondary meaning is "upon the party claiming its existence." *Quality Weaving Company v. Regan*, 245 Pa.Super. 66, 369 A.2d 296, 299 (1976).

Moreover, incidents of customer confusion resulting in mistakenly addressed correspondence does not establish that a term has a generally accepted meaning of a plaintiff's business. *See Miscellaneous, supra.*

¶ 10 In the case *sub judice*, the manager of Limerick Auto testified that Limerick Auto carries "a full range of advertising, as far as we do phone book,[6] billboards,[7] we have done some cable [television] advertising, we do radio advertising, we advertise to the local population in the schools,[8] to the general population, as far as Limerick Township, as far as we are involved in community affairs and things...." Notes of Testimony, 6/8/00, at 40. He also testified that he believed that Limerick Auto was a highly recognized name in the local general public. *Id.* at 47.

¶ 11 He testified as to several incidents of confusion involving members of the automotive business and the general public during the first six (6) months of Limerick Collision's existence, such as insurance company or rental car company personnel inquiring about the status of vehicles that were being repaired by Limerick Collision, not Limerick Auto. *Id.* at 55–56. There was an incident in which vehicle parts ordered by Limerick Auto were mistakenly delivered to Limerick Collision. *Id.* at 58–59. Another instance involved a vehicle assigned to Limerick Auto by State Farm Insurance that was taken to Limerick Collision instead. *Id.* at 59–61. The vehicle was repaired by Limerick Collision and deleted from Limerick Auto's computer, but the payment was still mistakenly made to Limerick Auto by State Farm.

*Id.* at 61–62. Limerick Auto also received mail on one occasion addressed to the owner of Limerick Collision, but delivered to Limerick Auto. *Id.* at 64. One man stopped at Limerick Auto wanting to retrieve something from his vehicle, but the vehicle had been taken to Limerick Collision. *Id.* at 66–67. On several instances salvage pools called to inquire about vehicles that were at Limerick Collision. *Id.* at 66. A driver for a parts supplier came into Limerick Auto to pick up a check that was supposed to be picked up at Limerick Collision. *Id.* at 70. Toyota Motor Credit called to verify repairs on a vehicle that had been serviced by Limerick Collision. *Id.* at 72. One customer indicated to Limerick Auto that he believed Limerick Auto had opened in a new location. *Id.* at 77–78.

■ ¶ 12 Limerick Auto's advertising has been extensive and effective. *Id.* at 47. Limerick Auto has failed to prove, however, that its advertising has established a secondary meaning for "Limerick" in the view of the purchasing public. There has been no testimony by any member of the public that "Limerick" is associated solely with Limerick Auto in the context of auto body repair. While we sympathize with Limerick Auto while it deals with the confusion caused by the opening of Limerick Collision, it simply has not shown that "Limerick" has acquired a secondary meaning in its competitive area. Without establishing a secondary meaning and thus a right to exclusive use of the term "Limerick", Limerick Auto cannot succeed on an action for un-

---

6. Limerick Auto advertises in three different telephone books, Phoenixville, Pottstown, and Norristown. N.T. at 40.

7. Billboard advertising was used intermittently within a fifteen (15) mile radius of Limerick Auto. N.T. at 45–46.

8. Advertising in the schools was done via high school sports teams' schedules. N.T. at 43.

fair competition. Because Limerick Collision's use of the term "Limerick" is not actionable, we believe that the Trial Court erred in issuing an injunction in favor of Limerick Auto. Accordingly, we are constrained to vacate the order of the Trial Court which granted the preliminary injunction.

¶ 13 Order vacated. Jurisdiction relinquished.

¶ 14 EAKIN, J., files a concurring opinion.

EAKIN, J., concurring:

¶ 1 "Limerick Auto" and "Limerick Collision"

¶ 2 Are so close one may clearly envision

¶ 3 That the two were the same,

¶ 4 So a limerick I frame,

¶ 5 And join in my colleagues' decision.