**Scranton Times v. Entercom Wilkes-Barre Scranton LLC**

*Joseph S. Sileo* and *Jennifer Walsh Clark,* for plaintiff.
*Michael E. Dash Jr.,* for defendants.

NEALON *J.,* March 24, 2011—The former employer of a radio show co-host seeks to preliminarily enjoin that radio personality and his current employer from utilizing the ex-employee's professional name and any fictional characters, comedic material or artistic product that he developed and published during his former employment. An evidentiary hearing was conducted on April 7, 2010 at which time testimony was received from William Lynett, Jeff Longaven, Ryan Flynn and John Gasper and ten exhibits were introduced into evidence. The factual findings set forth below are based upon the credible and

relevant evidence presented during that hearing.

## I. FINDINGS OF FACT

1.   Plaintiff Scranton Times, LP ("Scranton Times") owns the license to operate radio station WEZX, which is also known as Rock 107. Defendant Entercom Wilkes Barre Scranton, LLC ("Entercom") operates radio station WILK, which broadcasts on four AM and FM frequencies in the same competitive market as WEZX. WEZX/Rock 107 is a rock music radio station featuring comedic entertainment and musical parodies during its morning programming. WILK is a news talk radio station which features discussion of local and national news, commentary by its program hosts, and telephone calls from its listening audience. WILK does not broadcast any music entertainment.

2.   In the early 1980's, defendant John Gasper ("Gasper") was employed in the business office of WEZX and would periodically appear on its morning radio show as the fictional character "Swami Salami."

3.   In January 1985, Jeff Longaven ("Longaven") began hosting a morning radio show on WEZX using his on-air name "Jay Daniels."

4.   In early March 1985, Gasper joined Longaven as the co-host of the WEZX/Rock 107 morning radio show. At the suggestion of another radio station employee, Gasper assumed the on-air name "John Webster" and the radio show was identified and promoted as "Daniels & Webster."

5.   From March 1985 through March 30, 2010, Longaven and Gasper acted as the co-hosts of the Rock

107 morning radio show "Daniels & Webster," which featured classic rock music and comedic entertainment. During that time, Gasper frequently portrayed fictional characters known as "Walter Nepasky" and "Jonesy," and Longaven and Gasper jointly depicted other comedic characters identified as the "Scranton Dopes" and the "Pop Flies." In addition, Longaven and Gasper engaged in musical parodies and other comedic skits as part of the "Daniels & Webster" program.

6. From March 1985 through March 30, 2010, Scranton Times expended considerable resources in promoting the "Daniels & Webster" radio show through newspaper, television and billboard advertising, commemorative T-shirts, and CDs of their most popular performances. The advertisements and promotional materials portrayed "Daniels & Webster" and "D & W" collectively as a radio show team, rather than Jay Daniels or John Webster as individual or solo entertainers.

7. With the exception of rare occurrences attributable to illness or vacation, neither Longaven nor Gasper ever performed as a solo host on WEZX/Rock 107, and to the contrary, both radio personalities consistently broadcast together as the "Daniels & Webster" team.

8. On June 9, 2006, Scranton Times and Gasper executed an employment agreement for the three-year period from 6/9/06 through 6/9/09. The employment agreement identifies the Scranton Times as the "Employer" and Gasper as the "Performer" and states that the "Employer shall employ Performer as Air Talent" during the three-year term of employment. The signatories to the employment agreement were Gasper as the Performer and

Robert J. Lynett as the General Manager of the Scranton Times/WEZX. (See, plaintiff's petition for preliminary injunction, Exhibit A.)

9. Section 5.7 of the agreement entitled "Artistic Product" provides, in pertinent part, that:

Performer acknowledges and agrees that Employer will be the *sole and exclusive owner of* all rights in the show *or any character portrayed by performer, including name, likeness, comedic material, and distinctive characterizations thereof,* and the right to merchandise and exploit such show or role/character, and the right to use time to portray, exploit, merchandise or make any use of such comedic material or role/character unless approved in advance and in writing by Employer. Employer shall have the *right to use* and permit others to use *performer's name,* photograph, likeness, voice (or simulations thereof) and biography *in connection with advertising, publicizing, and exploiting the show,* and Employer's entertainment properties, or any parts thereof (including soundtrack albums, souvenirs, and other promotional items.) (*Id.,* p. 6) (italics added).

10. Gasper was the only signatory to the employment agreement who testified during the hearing on April 7, 2010. Gasper testified that Section 5.7 was intended to grant the Scranton Times exclusive ownership of the names of the comedic characters that he portrayed, such as Walter Nepasky, Jonesy, the Swami Salami, the Scranton Dopes and the Pop Flies. Gasper testified that although Section 5.7 granted the Scranton Times the right to use Gasper's on-air name "John Webster" to advertise and promote the "Daniels & Webster" show, it did not vest the

Scranton Times with exclusive ownership of Gasper's on-air name.

11. Pursuant to Section 2 of the agreement, the Scranton Times or Gasper could "elect to terminate the automatic extension" of the employment contract's term "by giving sixty (60) days written notice of such election on or before the expiration date." In compliance with Section 2, Gasper timely advised WEZX's General Manager of his decision not to automatically renew his employment agreement. Nevertheless, from June 2009 through March 30, 2010, Gasper and the Scranton Times continued to negotiate the terms of a possible renewal contract.

12. While Gasper was engaged in those contract negotiations with the Scranton Times in early 2010, and unbeknownst to the Scranton Times, Gasper was also participating in discussions with Entercom regarding possible employment as a radio host on WILK.

13. On March 30, 2010, Gasper resigned from his position with WEZX/Rock 107 and announced his acceptance of employment with Entercom/WILK.

14. Gasper's employment agreement with Entercom grants Entercom sole and exclusive ownership of Gasper's on-air name "John Webster" only for the duration of his employment relationship with Entercom.

15. On March 31, 2010, Entercom began to broadcast promotions of "John Webster" as WILK's new morning radio show co-host with WILK's existing morning show co-host, Nancy Kman.

16. When contacted by *The Times Leader* reporter, Mike McGinley, on March 31, 2010, Entercom's Vice-

President/Market Manager, Ryan Flynn, stated that the hiring of Gasper is "a high-profile type of move that gives us the ability to expand the WILK brand and capitalize on the reputation of John Webster in this market." Similarly, when interviewed by the *Scranton Times* staff writer, Stacy Brown, on March 31, 2010, Mr. Flynn remarked that "[t]his is a high-profile move that gives us the ability to expand the WILK brand and capitalize on the tremendous reputation of John Webster in this market."

17. On April 2, 2010, counsel for the Scranton Times forwarded a communication to Ryan Flynn demanding that Entercom "cease and desist" from any use of the name "John Webster" or any comedic characters or material created and aired by the "Daniels & Webster" show.

18. Gasper is scheduled to commence employment with Entercom on April 12, 2010 as the co-host of WILK's morning news talk radio program with Nancy Kman.

19. Since WILK's morning radio program features news discussion, program host commentary and telephone conversations with listeners, the fictional characters and comedic material developed by Gasper in connection with the "Daniels & Webster" show are not compatible with WILK's news talk radio format.

20. The Scranton Times has not yet determined what the new format will be for its morning radio show on Rock 107, nor has it decided who the host(s) will be for that program. However, the Scranton Times has not foreclosed the possibility that it may hire a new co-host for its morning radio show on Rock 107 and continue to call that program "Daniels & Webster".

21. The Scranton Times presented the instant petition for a preliminary injunction on April 7, 2010, and an evidentiary hearing was conducted on that date.

## II. DISCUSSION

### (A) *STANDARD OF REVIEW*

To establish its right to the issuance of a preliminary injunction, the Scranton Times must prove that: (1) an injunction is necessary to prevent immediate and irreparable harm which cannot be adequately compensated by damages; (2) greater injury would result from refusing an injunction than from granting it; (3) an injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) its right to relief is clear, i.e., the Scranton Times is likely to prevail on the merits; (5) the injunction sought is reasonably suited to abate the offending activity; and (6) a preliminary injunction will not adversely affect the public interest. *Pennsylvania Gaming Control Board v. City Council of Philadelphia*, 593 Pa. 241, 277-278, 928 A.2d 1255, 1277 (2007); *Pennsylvania State Education Association v. Com., Office of Open Records*, 981 A.2d 383, 385 (Pa. Cmwlth. 2009). Relying upon the language of the employment agreement and federal and state trademark law, the Scranton Times submits that it is entitled to a preliminary injunction barring Gasper and Entercom from using the name "John Webster" or any comedic characters and materials that he developed on "Daniels & Webster."

### (B) *CONTRACT CLAIM*

The Scranton Times' first argument involves the interpretation of Section 5.7 of the employment agreement.

In construing the language of a contract, the court must ascertain and effectuate the intent of the parties. *Crawford Central School District v. Com. of Pennsylvania*, 585 Pa. 131, 143, 888 A.2d 616, 623 (2005). When the words of an agreement are clear and unambiguous, the intent of the parties is to be determined from the language employed in the agreement. *LJL Transp, Inc. v. Pilot Air Freight Corp.*, 599 Pa. 546, 559, 962 A.2d 639, 647 (2009). The language of a contract may be deemed ambiguous if it is "reasonably or fairly susceptible of different constructions" and is capable of being understood in more than one sense. *Betz v. Erie Insurance Exchange*, 957 A.2d 1244, 1253 (Pa. Super. 2008); *Black v. Jamison*, 913 A.2d 313, 318 (Pa. Cmwlth. 2006), app. denied, 592 Pa. 774, 926 A.2d 442 (2007).

Any contractual ambiguities must be construed against the drafter of the agreement. *Rekun v. Pelaez*, 976 A.2d 578, 581 (Pa. Super. 2009); *Vinikoor v. Pedal Pennsylvania, Inc.*, 974 A.2d 1233, 1238 (Pa. Cmwlth. 2009); *Lane v. Com. of Pennsylvania*, 954 A.2d 615, 619 (Pa. Super. 2008). When attempting to clarify or resolve any ambiguity, courts are free to consider extrinsic parol evidence concerning the disputed language in the instrument. *Rekun*, supra; *Vinikoor*, supra. Furthermore, the words of an agreement cannot be viewed in isolation and must be analyzed within the context that they appear, including whether the terms at issue are preceded by specific reference to a particular subject. See, *Eighth North Valve. Inc. v. William L. Parkinson. D.D.S., P.C. Pension Trust*, 773 A.2d 1248, 1255 (Pa. Super. 2001); *Smith v. SEPTA*, 707 A.2d 604, 608 (Pa. Cmwlth. 1998); *Housing and Redevelopment Insurance Exchange (HARIE) v.*

*Lycoming County Housing Authority,* 58 D. & C. 4th 321, 345 (Lacka. Co. 2001), aff'd, 809 A.2d 1096 (Pa. Cmwlth. 2002).

The language of Section 5.7 grants the Scranton Times two categories of naming rights. First, it states that the Scranton Times is "the sole and exclusive owner of...any character portrayed by Performer, including name, likeness, comedic material, and distinctive characterizations" of any such character. Second, the agreement provides that the Scranton Times possesses the "right to use...Performer's name, photograph, likeness, voice (or simulations thereof) and biography in connection with advertising, publicizing, and exploiting" the "Daniels & Webster" show. Examining the quoted language within the context that it appears, the only reasonable construction of Section 5.7 is that it furnishes the Scranton Times exclusive ownership of the names and comedic material of Walter Nepasky, Jonesy, the Swami Salami, the Scranton Dopes, the Pop Flies and any other fictional or comedic character portrayed by Gasper on the "Daniels & Webster" show. However, with regard to the "Performer's name," i.e., "John Webster," the Scranton Times merely acquired the non-exclusive right to use that name in advertising and publicizing the "Daniels & Webster" show. Nothing contained in Section 5.7 expressly grants the Scranton Times sole and exclusive ownership of the Performer's on-air name "John Webster."

The Scranton Times contends that it maintains sole and exclusive ownership of Gasper's on-air name "John Webster" since "any 'character portrayed by Performer' encompasses the on-air name 'John Webster.'" (Plaintiff's

brief in support of petition for preliminary injunction, p.10.) If the Scranton Times had intended to secure exclusive ownership of the "Performer's name" that he used while broadcasting as an "Air Talent" on Rock 107 and to perpetually deprive Gasper of his right to use his on-air name, it could have drafted its own agreement to state "that Employer will be the sole and exclusive owner of Performer's name 'John Webster.'" See, *Maloney v. Valley Medical Facilities, Inc.*, 946 A.2d 702, 707 (Pa. Super. 2008) (discussing "the well settled principle that 'an agreement or instrument which reduces legal rights which would otherwise exist...must spell out with the utmost particularity the intention of the parties.'"), aff'd, 984 A.2d 478 (Pa. 2009); *HARIE*, 58 D. & C. 4th at 346-347 ("We are mindful that HARIE, as the drafter of the insurance [contract], had the ability to control its exposure and indemnity obligations by inserting language that expressly excluded liability for constitutional torts or by defining the phrase 'wrongful act' more narrowly so as to eliminate coverage for claims involving violations of the First Amendment, Due Process clause or Whistleblower Law."). Instead, the Scranton Times merely granted itself the non-exclusive right to use the Performer's name in advertising and promoting the "Daniels & Webster" show, and confined its exclusive ownership rights to any characters portrayed and comedic material developed by the Performer. We must construe the agreement as written and may not modify the plain meaning of the contract language "under the guise of interpretation."[1]

---

1. To the extent that the pertinent language of Section 5.7 is reasonably susceptible to different interpretations with respect to the Scranton Times' exclusive ownership rights, that language is deemed to be ambiguous and must be construed against the Scranton Times as

*Szymanowski v. Brace*, 987 A.2d 717, 722 (Pa. Super. 2009), reargument denied (Jan. 28, 2010); *Thompson v. T. J. Whipple Construction Company*, 985 A.2d 221, 230 (Pa. Super. 2009), *app. denied*, 986 A.2d 152 (Pa. 2009).

In an effort to challenge the aforementioned interpretation of the employment agreement, the Scranton Times asserts that the reference to the "Performer's name" in the final sentence of Section 5.7 relates solely to the name "John Gasper," not "John Webster." To that end, the Scranton Times posits:

> The final sentence in Section 5.7 provides that [the Scranton Times] "shall have the right to use and permit others to use Performer's name...." Clearly, that particular phrase presumes that John Gasper would "own" his own name - John Gasper - but gave [the Scranton Times] the right to use, and permit others to use, that name - John Gasper. (Plaintiff's brief in support of petition for preliminary injunction, p. 11).

Such an interpretation is inconsistent with the evidence introduced by the Scranton Times during the hearing on April 7, 2010. The Scranton Times argued at that time that it has devoted substantial sums of money to marketing and promoting the "Daniels & Webster" show through advertisements and publications that have included references to "John Webster" and "Jay Daniels." The evidentiary record is completely devoid of any suggestion that the Scranton Times ever used, or even considered using, the name "John Gasper" in any advertisements for the "Daniels & Webster" show. Simply stated, the

---

the drafter of the agreement. See, *Rekun*, supra; *Vinikoor*, supra; *Lane*, supra.

Scranton Times would have no interest in obtaining "the right to use" the name "John Gasper" in connection "with advertising, publicizing, and exploiting the show," and the record reflects that the Scranton Times never used the name "Gasper" when promoting the "Daniels & Webster" show. Hence, any proffered construction of Section 5.7 to the effect that the reference to the "Performer's name" relates to "John Gasper" rather than "John Webster" is without merit.

In the event that the contract language in question is regarded as ambiguous, it is appropriate to consider extrinsic parol evidence in attempting to resolve any such ambiguity. See, *Rekva*, supra; *Vinikoor*, supra. The only parol evidence presented by a signatory to the employment agreement consisted of the sworn testimony of Gasper. As indicated in Finding of Fact No. 10 above, Gasper has ascribed a meaning to Section 5.7 which is consistent with our interpretation that is premised upon well established rules of contract construction. The Scranton Times did not offer any contrary testimony from its signatory to the agreement during the injunction hearing on April 7, 2010.

"A preliminary injunction is an extraordinary remedy and should only be granted where the plaintiff has established a clear right to the relief request." *Hart v. O'Malley*, 544 Pa. 315, 318 n. 1, 676 A.2d 222, 223 n. 1 (1996). In the case at bar, the Scranton Times has demonstrated a clear right to enjoin Gasper and Entercom from making use of the various comedic characters portrayed by Gasper on Rock 107, including Walter Nepasky, Jonesy, the Swami Salami, the Scranton Dopes and the Pop Flies. The Scranton Times is also entitled to

a preliminary injunction barring Gasper and Entercom from using any of the musical parodies or artistic material developed and broadcast by Longaven and Gasper during the 25-year history of the "Daniels & Webster" show.[2] Such limited injunctive relief is necessary to prevent immediate and irreparable harm, to restore the status quo, and to reasonably abate offending activity. See, *Penna, Gaming Control Board*, supra. However, the Scranton Times has not established a contractual basis for prohibiting Gasper from using his professional name "John Webster" while employed by Entercom. Consequently, based upon the language of Section 5.7 of Gasper's employment agreement, Gasper and Entercom will be preliminarily enjoined from using the names of the comedic characters portrayed by Gasper and the musical and artistic product developed by him individually or jointly in connection with the "Daniels & Webster" show.

### (C) *STATE AND FEDERAL TRADEMARK CLAIMS*

The Scranton Times alternatively requests the issuance of a preliminary injunction based upon trademark infringement law.[3] There is a paucity of trademark law

---

2. Entercom and Gasper do not appear to oppose such a partial grant of injunctive relief. Specifically, in their initial submission in opposition to the Scranton Times' petition, Entercom and Gasper have represented:

Entercom repeatedly has made clear to the Scranton Times that Entercom has no intention of using or allowing Mr. Webster to air any of the "characters" Mr. Webster portrayed on the Daniels & Webster show...Entercom has neither the need nor intention to allow Mr. Webster to portray those "characters" -- and has made that point to the Scranton Times already.

(Defendants' opposition to petition for preliminary injunction, pp. 2-3).

3. In its post-hearing brief, the Scranton Times interchangeably r - quests relief based upon "unfair competition" and "trademark infringement." (See, defendants' brief in support of petition for preliminary injunction, pp. 7-8, 13-19.) The common law of trademarks is considered to be a component of the broader law of unfair competition. See,

discussing an individual's right to continue using a professional name as an entertainer or performer, and even less authority addressing the ability of a former employer to permanently prohibit an ex-employee from using an on-air name. The great weight of "trade name" precedent relates to product labels or business names that have arguably earned trademark protection under federal or state law.

To secure injunctive relief in a state law trademark infringement action, the petitioner must prove that: (1) it has a legal right to exclusive use of the name; (2) defendant is making use of a name that is confusingly similar to the subject name; and (3) defendant's use of the name is likely to cause confusion in the petitioner's competitive area. *Zimmerman v. Holiday Inns of America*, 438 Pa. 528, 534-535, 266 A.2d 87, 90 (1970), cert. denied, 400 U.S. 992 (1971); *Limerick Auto Body, Inc. v. Limerick Collision Center, Inc.*, 769 A.2d 1175, 1179 (2001), *app. denied*, 567 Pa. 751, 788 A.2d 381 (2001).

It is well settled in Pennsylvania "that an individual is entitled to the use of his own name in his business, unless he has by contract deprived himself of that right." *Ralph Bros. Furniture Company v. Ralph & Sons*, 338 Pa. 360, 363, 12 A.2d 573, 574 (1940). Accord, *Seligman v. Fenton*, 286 Pa. 372, 375, 133 A. 561, 562 (1926) ("Every man has the absolute right to use his own name in his business, even though he may thereby interfere with and injure the business of another bearing the same name...."); *Brody's,*

---

*Thomson-Peorcelite Co. v. Harad*, 356 Pa. 121, 124, 51 A.2d 605, 606 (1947). Since the parties' submissions primarily address their dispute as a trademark issue, we will refer to the Scranton Times' claim as trademark infringement for ease of reference.

*Inc.*, 454 A.2d at 607 ("however, the test for infringement is completely different under Pennsylvania law when, as in the instant case, the trade name sought to be enjoined is also the personal name of the party using it."). It is equally clear that descriptive, geographical and generic words, as well as words of common or general usage, belong to the public and are not capable of exclusive appropriation. *Zimmerman v. B. & C. Motel Corporation*, 401 Pa. 278, 282, 163 A.2d 884, 886 (1960); *Pennsylvania State University v. University Orthopedics, Ltd.*, 706 A.2d 863, 871 (Pa. Super. 1998). These general axioms are subject to the limitation or exception that if a particular name has acquired a "secondary meaning" in the trade or the minds of the purchasing public, the trade name will be protected against infringement. *Limerick Auto Body, Inc.*, 769 A.2d at 1179-80 (quoting *Koolvent Metal Awning Corp. v. Price*, 368.Pa. 528, 532, 84 A.2d 296, 298 (1951); *Pennsylvania State University*, supra; *Brody's, Inc.*, 454 A.2d at 607 n. 3 ("...names primarily understood to be personal names are not inherently distinctive and can be protected as trade names only when they have acquired secondary meaning.").

"No clear test has emerged in Pennsylvania as a satisfactory method of establishing the existence of a secondary meaning." *Limerick Auto Body. Inc.*, 769 A.2d at 1180. The term "'secondary meaning' encompasses the situation where people in the trade or purchasing public come to think of a word or name as standing for the business of a particular owner." *Holiday Inns of America. Inc.*, 438 Pa. at 535, 266 A.2d at 90; *Brody's Inc.*, supra; *Fox Broadcasting Company v. Fox Broadcasting Company*, 1986 WL 11445 at * 7 (E.D. Pa. 1986). Although advertising

is one of several relevant factors to be considered in making that determination, see, *Miscellaneous. Inc. v. Klein's Fashions, Inc.*, 452 Pa. 62, 65, 305 A.2d 22, 24 (1973), "advertising by itself, no matter how extensive, is insufficient to establish a secondary meaning." *Limerick Auto Body, Inc.,* supra. See also, *B & C Motel Corp.*, 401 Pa. at 283, 163 A.2d at 886; *Quality Weaving Co. v. Regan*, 369 A.2d 296, 299 (1976). Moreover, to demonstrate the requisite secondary meaning, the supporting "witness testimony must be representative of the purchasing public in the plaintiff's competitive area and must establish that the purchasing public views a term as representing the plaintiff's business." *Limerick Auto Body, Inc.,* supra. The burden of proving such a secondary meaning is upon the party claiming its existence. *Limerick Auto Body, Inc.,* 769 A.2d at 1180 n. 5; *Brody's, Inc.,* supra.

Entercom and Gasper submit that the name "Webster" is so common that the full name "John Webster" is incapable of a secondary meaning in the eyes of the consuming public. For example, Entercom and Gasper note that "Webster's" is "a widely distributed dictionary" and "Webster" was "a 1980's television series starring Emmanuel Lewis." (Defendants' Supplemental Brief in Further Opposition to petition for preliminary injunction, p. 2 n.1.) Entercom and Gasper further assert that "John Webster" was the name of "an English playwright who was a contemporary of William Shakespeare" and "a governor of the Colony of Connecticut," and is currently the listed name of more than one person "in local phone books." (*Id.,* at pp. 2-3 n.1.)

It is unclear whether a local radio entertainer's professional name can attain trademark status under

Pennsylvania law. As the Supreme Court of Pennsylvania observed more than a century ago:

> It has often been held that a trademark or a trade name, representing an article of commerce or a local business, is property which may be disposed of; but the name of an artist, an author, a musician, or a lawyer has never been regarded as a trade name, and as such saleable. *Blakely v. Sousa*, 197 Pa. 305, 332, 47 A. 286, 288 (1900). Accord, *Heller v. Miller*, 33 D. & C. 257, 258 (Schuylkill Co. 1938) ("It is settled that a person may transfer to another the right to use his name...with the exception that the name of an artist, an author, a lawyer or other professional is not a trade name and is not, as such, saleable.").

Assuming arguendo that an entertainer's professional name can achieve common law trade name protection, the evidence introduced by the Scranton Times did not satisfy its burden of proving that the name "John Webster" has acquired a secondary meaning in the minds of "the purchasing public." See, *Limerick Auto Body, Inc.*, supra. No member of the purchasing public testified that [s]he regards the name "John Webster" as so closely associated with Rock 107 that [s]he would believe that [s]he was listening to WEZX if [s]he heard WILK's co-host referred to as "John Webster." Compare *Pennsylvania State University*, 706 A.2d at 870 ("[Penn State University] documented at least 34 instances, over a seven-month period, when consumers of medical services or members of the medical community mistakenly contacted its Center for Sports Medicine, believing they were contacting [University Orthopedics].") and *Miscellaneous, Inc.*, 542 Pa. at 64, 305 A.2d at 24 (finding that the testimony of

one customer and an employee's fiance "that when they heard the word 'Miscellaneous' they thought of plaintiff's store" was insufficient as a matter of law "to establish the 'secondary meaning' required to enable plaintiff to prevail."). While it is true that the Scranton Times has expended significant time and resources in promoting the "Daniels & Webster" show during the past 25 years, which publicity has included incidental references to "Jay Daniels" and "John Webster," such extensive advertising alone cannot demonstrate a secondary meaning under Pennsylvania case law. See, *Koolvent Metal Awning Corp.*, 368 Pa. at 534, 84 A.2d at. 299 ("The only basis on which a court could find in this case that the word 'Koolvent' had acquired a secondary meaning...arises from the extensive national and substantial local advertising of the plaintiff over a period of several years. This is not sufficient."). Based upon the available evidentiary record submitted for our review, the Scranton Times has failed to adequately prove that the name "John Webster" possesses the requisite "secondary meaning" to warrant trademark protection.

The Scranton Times also requests injunctive relief based upon Section 43(a) of the Lanham Act which provides that a person may not use a word or name "in connection with any goods or services" if such use "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person...." 15 U.S.C. §1125(a)(1)(A). To prove trademark infringement or unfair competition under 15 U.S.C. §1125(a)(1)(A), a

plaintiff must prove that: (a) the mark or name is valid and legally protectable; (b) the plaintiff owns the mark or name; and (c) the defendant's use of the mark or name to identify goods or services causes a likelihood of confusion. *Commerce National Insurance Services, Inc. v. Commerce Insurance Agency. Inc.,* 214 F.3d 432,437 (3d Cir. 2000); *Opticians Association of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir. 1990); *Tillery v. Leonard & Sciolla, LLP,* 437 F.Supp. 2d 312, 320 (E.D. Pa. 2006).

The level of protection afforded to the claimed trademark depends upon whether the challenged term is classified as "arbitrary," "suggestive," "descriptive" or "generic." In *Pennsylvania State University,* supra, the Superior Court of Pennsylvania quoted federal precedent and described those four designations as:

> ...arbitrary (or fanciful) terms, which bear "no logical or suggestive relation to the actual characteristics of the goods;" suggestive terms, which suggest rather than describe the characteristics of the goods; descriptive terms, which describe a characteristic or ingredient of the article to which it refers, and generic terms, which function as the common descriptive name of a product class." *Pennsylvania State University,* 706 A.2d at 868. See also, *Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.,* 269 F.3d 270, 282 (3d Cir. 2001).

Arbitrary or suggestive marks are considered inherently distinctive and automatically qualify for trademark protection whereas descriptive marks are afforded such protection only where a "secondary meaning" is proven.

*Pennsylvania State University,* supra. A generic term may not be appropriated from the public domain for the exclusive use of one party, and as such, trademark protection is never extended to generic terms under federal law. *Id.* In determining whether a term is arbitrary, suggestive, descriptive or generic, the court must apply the "primary significance test" which requires the party asserting trademark protection to establish that "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Id.,* at n. 4.

The Scranton Times contends that the name "John Webster" is an arbitrary term that is inherently distinctive and automatically entitled to trademark protection. (See, plaintiff's brief in support of petition for preliminary injunction, p.13.) ("For the reasons set forth below, the 'John Webster' trade name is clearly an arbitrary trademark, and thus is entitled to the highest degree of protection.") However, federal decisional precedent, including several holdings from within the Third Circuit, uniformly consider personal names and surnames to be "descriptive" terms that are afforded trademark protection only upon a showing of distinctiveness and secondary meaning. See, *AFL Philadelphia, LLC v. Krause,* 639 F. Supp. 2d 512, 526 (E.D. Pa. 2009); *Lewis v. Marriott International, Inc.,* 527 F. Supp. 2d 422, 426 (E.D. Pa. 2007); *Tillery,* 437 F. Supp. 2d at 320-321; *Castle Oil Corp. v. Castle Energy Corp.* 1992 WL 394932 at * 11 (E.D. Pa. 1992). Accord, *Pirone v. MacMillen, Inc.,* 894 F.2d 579, 583 (2d Cir. 1990); *Suisman Shapiro, P.C. v. Suisman,* 2006 WL 387289 at * 5 (D. Conn. 2006); *DeClemente v. Columbia Pictures Industries. Inc.,* 860 F. Supp. 30, 43 (E.D. N.Y. 1994); *V. LaRosa & Sons, Inc. v. DeRosa Cheese & Macaroni*

*Co., Inc.,* 1986 WL 8699 at *3 (D. Neb. 1986). A personal name acquires secondary meaning when the name and the business it is associated with "become synonymous in the public mind and the secondary meaning submerges the primary meaning of the name as a word identifying a person, in favor of its meaning as a word identifying that business." *AFL Philadelphia LLC,* 639 F. Supp. 2d at 526; *Lewis,* 527 F. Supp. 2d at 426; *Tillery,* 437 F. Supp. 2d at 321 (quoting 2 McCarthy on Trademarks and Unfair Competition at §13.3 (4th Ed.)).

"Proof of secondary meaning entails vigorous evidentiary requirements," *Tillery,* supra (quoting *Flynn v. A. K. Peters, Ltd.,* 377 F. 3d 13, 20 (1st Cir. 2004)), and requires the party claiming trademark protection to "not only show that it used the personal name as a trademark, but that a substantial portion of the consuming public associates the name specifically with its business." *AFL Philadelphia, LLC,* supra. The United States Court of Appeals for the Third Circuit has developed the following non-exhaustive list of factors which may be considered in determining whether a term has acquired a secondary meaning:

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion. *E. T. Browne Drug Company v. Cococare Products, Inc.,* 538 F.3d 185, 199 (3d Cir. 2008); *Commerce National Insurance Services. Inc.,* 214 F.3d at 438.

Based upon the evidence presented, the Scranton Times' request for relief under the Lanham Act must likewise fail. First, as discussed in Section II(B) above, the Scranton Times has not established that it owns the name "John Webster," and as such, it cannot satisfy its burden of proof under federal law. See, *Commerce National Insurance Services, Inc.*, 214 F. 3d at 437; *Opticians Association of America,* 920 F. 2d at 192. Second, the Scranton Times has not produced any evidence that the name "John Webster" and WEZX/Rock 107 have "become synonymous in the public mind" or "that a substantial portion of the consuming public associates the name [John Webster] specifically with [WEZX/Rock 107]." *AFL Philadelphia, LLC,* supra; *Tillery,* supra. The Scranton Times has offered no customer testimony, nor has it introduced evidence of customer surveys. See, *E. T. Browne Drug Company,* 538 F.3d at 201 ("Browne's failure to conduct a secondary meaning survey leaves it without evidence of any sort in this case of the secondary meaning of the term 'Cocoa Butter Formula.'"); *Tillery,* 437 F. Supp. 2d at 321 ("No customer surveys or customer testimony are in evidence."); *Castle Oil Corp.,* supra at * 11 ("plaintiff introduced no evidence such as a survey of the views of purchasers and prospective purchasers."). Although the Scranton Times did present evidence of extensive marketing of its morning radio show, any promotion of "John Webster" was always in conjunction with the "Daniels & Webster" team rather than as "John Webster" individually. See, *E.T. Browne Drug Company,* 538 F. 3d at 200 ("Browne has introduced no evidence indicating that it ever used 'Cocoa Butter Formula' as a stand alone term in marketing or packaging. Instead, it always used the term connected with the 'Palmer's,' forming the phrase 'Palmer's Cocoa Butter

Formula.'"). Additionally, the Scranton Times did not submit any evidence of actual confusion by the consuming public. See, *Commerce National Insurance Services, Inc.,* 214 F. 3d at 440 ("CBI was unable to produce a single instance of actual confusion between it and CIA."). As a result, the Scranton Times has not properly demonstrated that the name "John Webster" has acquired a secondary meaning under federal trademark law.

Accordingly, the Scranton Times has not established its right to enjoin Gasper and Entercom from using the name "John Webster" under federal or state trademark law. As stated in Section II(B) above, partial injunctive relief will be granted as to the fictional characters portrayed and comedic material developed by Gasper on the "Daniels & Webster" show, as per Section 5.7 of the employment agreement. Since Pa. R.C.P. 1531(b) mandates the posting of bond or the deposit of legal tender whenever any form of injunctive relief is granted, and the limited relief granted has not been contested by Entercom or Gasper, the Scranton Times will be directed to post nominal bond or deposit nominal legal tender in the amount of $1.00. See, *Pleasant Hills Const. Co., Inc. v. Public Auditorium Authority of Pittsburgh,* 782 A.2d 68, 81 (Pa. Cmwlth. 2001) (affirming trial court ruling requiring nominal bond of $1.00), order rev'd on other grounds, 567 Pa. 38, 784 A.2d 1277 (2001); *Christo v. Tuscany. Inc.,* 368 Pa. Super. 9, 12, 533 A.2d 461, 463 (1987) (trial court order requiring nominal bond of $1.00), appeal discontinued, 520 Pa. 601, 553 A.2d 964 (1988). An appropriate order follows[4].

---

4. In *Conti v. Anthony's Shear Perfection. Inc.,* 504 A.2d 1316 (Pa. Super. 1986), the Superior Court of Pennsylvania held that an unregistered or unregistrable name is entitled to common law protection if either (a) the name has earned a secondary meaning or (b) the similarity

ORDER

And now, April 10, 2010, upon consideration of the petition for preliminary injunction filed by plaintiff Scranton Times, LP, the defendants' response thereto, the exhibits and memoranda of law submitted by the parties, and the evidence introduced during the hearing on April 7, 2010, and based upon the factual findings and legal conclusions set forth in the foregoing memorandum, it is hereby ordered and decreed that:

1.   Plaintiff's petition for a preliminary injunction is granted in part and denied in part;

2.   Plaintiff's petition for a preliminary injunction is denied to the extent that it seeks to enjoin defendants

---

between the subject name and another name has the tendency to deceive the consuming public. *Id.*, at 1320. Under the latter standard, it is not necessary for the public to actually be deceived as a prerequisite to injunctive relief; rather, "[a]ll that is required is that the infringement should have a tendency to deceive." *Id.* (quoting *Shaw & Co. v. Pilling & Son,* 175 Pa. 78, 87, 34 A. 446, 447 (1896)). Thus, if a petitioner can "establish that the similarity in names would have a tendency to deceive, [s]he would be entitled to injunctive relief." *Conti.,* supra at 1320 (concluding that owner of hair salon "Shear Perfection" could enjoin another salon named "Anthony's Shear Perfection" from identifying his salon with the phrase "Shear Perfection").

Although the available record does not establish that the name "John Webster" is so closely identified with WEZX/Rock 107 as to warrant trade name protection, it is conceivable that the Scranton Times may ultimately be able to prove that the phrase "Daniels & Webster" has become synonymous with WEZX/Rock 107 such that Entercom's marketing of a "Kman & Webster" show could be deemed strikingly similar to "Daniels & Webster" and arguably "have a tendency to deceive" the public and grant WILK "an unfair benefit from another's trade." *Conti,* 504 A.2d at 1320. However, Entercom has represented in its submissions that "Entercom has no intention of utilizing the names Daniels & Webster, D & W, *or anything even remotely similar to them* — nor has the Scranton Times even alleged that Entercom intends to do so." (Defendants' supplemental brief in further opposition to petition for preliminary injunction, p. 6.) (italics added.)

Entercom Wilkes Barre Scranton LLC and John Gasper from using the name "John Webster" in connection with defendant John Gasper's employment as a radio program co-host with defendant Entercom Wilkes Barre Scranton, LLC commencing on Monday, April 12, 2010;

3.  Plaintiff's petition for a preliminary injunction is granted to the extent that it seeks to enjoin the defendants from using any fictional characters, comedic materials, musical parodies or other artistic product developed or broadcast by defendant John Gasper a/k/a John Webster, individually or jointly with Jeff Longaven a/k/a Jay Daniels, in connection with the "Daniels & Webster" show, including use of the comedic characters "Walter Nepasky," "Jonesy," "the Swami Salami," "the Scranton Dopes" and "the Pop Flies"; and

4.  Inasmuch as partial injunctive relief is being granted, albeit without affirmative opposition by the defendants, the plaintiff is directed to either post nominal bond in the amount of $1.00 pursuant to Pa. R.C.P. 1531(b)(1) or deposit with the clerk of judicial records legal tender in the amount of $1.00 in accordance with Pa. R.C.P. 1531(b)(2).